KATHLEEN B. PELLEGRINO & others[1] *vs.* CITY COUNCIL
OF SPRINGFIELD & another[2]
(and a companion case[3]).

Hampden.    May 16, 1986. — June 30, 1986.

Present: BROWN, PERRETTA, & FINE, JJ.

*Zoning*, Hospital, Special permit. *Words*, "Hospital."

An office building for the medical staff of a hospital, which was to be
connected physically to one of the main buildings in a hospital complex,
would, as proposed, be an integral part of a unified hospital facility and
thus would come within the scope of a provision in a city's zoning
ordinance exempting hospitals from the height limitations applicable to
other buildings. [463-467]

CIVIL ACTIONS commenced in the Superior Court Department
on April 11 and June 17, 1985, respectively.

The cases were heard by *John F. Moriarty*, J.

*Francis D. Dibble, Jr.*, for Baystate Medical Center, Inc.

*Bruce L. Leiter*, Associate City Solicitor, for City Council
of Springfield, was present but did not argue.

FINE, J.  The Baystate Medical Center, Inc. (Baystate), a
large metropolitan teaching hospital in Springfield, proposes
to construct an office building for its medical staff on what
Baystate refers to as its north campus. The north campus is a
tract of land with an area of over fifty acres on which are
located several hospital buildings, one a five-story building
presently under construction. As planned, the proposed physi-
cians' office building also would be a five-story building. It

---

[1] The other four plaintiffs are neighbors claiming to be aggrieved by the
action of the city council in granting a special permit to the defendant
Baystate Medical Center, Inc.

[2] Baystate Medical Center, Inc.

[3] The companion case is between the same parties.

would contain 78,000 square feet of floor space. It would be located seventy-five feet from the building under construction and would be connected to that building by an enclosed corridor. The proposed building would provide office space for seventy staff physicians and parking for 350 cars. The hospital would own the building and lease it to a limited partnership of which Baystate would be the general partner and the tenants limited partners.

The north campus of Baystate is located in an area in Springfield zoned for residential use. In such a zoning district neither a hospital nor an office building for physicians is permitted as of right. When authorized by a special permit from the Springfield city council, property may be used, among other things, for a hospital or sanatorium or, with certain limitations, as offices for a doctor, oral surgeon, or dentist. Springfield zoning ordinance § 301(6)(b) and (d). A special permit may be granted only if: "The specific site is an appropriate location for such a use, structure, or condition[; t]he use as developed will not adversely affect the neighborhood[; and] adequate and appropriate facilities will be provided for the proper operation of the proposed use." Springfield zoning ordinance § 2005(7). Section 503 of the ordinance deals with what has become the stumbling block for realization of Baystate's plan.

It provides:

> "Height. No building or structure shall exceed two stories and an attic or thirty-five (35) feet, except that a school (other than college buildings), library, or municipal or institutional building may be erected to a height not to exceed three (3) stories, in no case shall such building of three (3) stories or less exceed sixty (60) feet. *Hospitals*, college buildings, belfries, and flag and radio poles *are exempt* from this provision (emphasis supplied)."

Baystate applied to the city council for a special permit to construct the proposed medical office building. On March 25, 1985, following a public hearing, the city council granted the

special permit with certain conditions.[4] The city council made all of the general findings required by § 2005(7) of the zoning ordinance for the issuance of special permits. Insofar as material, given the present posture of the case, the special permit was conditioned upon the medical office building's being no higher than the building under construction to which the office building would be connected by the enclosed corridor. This meant the office building could be five stories high.

Residents of the neighborhood claiming to be aggrieved by the grant of the special permit brought these actions in the Superior Court under G. L. c. 40A, § 17. The judge heard evidence for several days. Much of the evidence concerned the relationship between physicians' office buildings and large modern hospital complexes such as Baystate. Based upon the evidence, the judge made careful and helpful findings on all the questions before him,[5] including the relationship between hospitals such as Baystate and contiguous staff office buildings. He found as follows:

> "[G]ood, modern hospital administration includes (and may even require) the availability on or near the grounds of a large general hospital of medical office facilities designed to accommodate those physicians and surgeons who are members of the medical staff of the hospital. The availability of such facilities is beneficial to the hospital, to the doctors who occupy them, and to the patients of both.
>
> "The availability of such facilities enables a hospital to attract better physicians and surgeons to its medical staff and to organize diagnostic-related groups of specialists in close association with each other. In the case of a teaching hospital such as [Baystate], it provides a better opportunity for close contact between teachers and interns.

---

[4] Two of the conditions were eliminated as the result of a vote of the city council on May 28, 1985, amending its original vote authorizing the special permits. Both the original decision and the amended decision were the subject of separate, now consolidated, actions brought in the Superior Court.

[5] Just as the city council had, the judge made all the general findings required by § 2005(7) of the ordinance for issuance of a special permit.

"From the point of view of the doctors, having one's office on or in close proximity to the grounds of the hospital in which one primarily conducts one's practice permits maximum utilization of working hours, the ability to respond more quickly to the needs of hospitalized patients and the opportunity to consult more readily and more directly both with other practitioners in one's specialty and with practitioners of other medical specialties. It is also, no doubt, a valuable source of referrals from other doctor-tenants.

"From the point of view of the patient, such a facility provides a central location where numerous types of medical expertise are readily available if needed with easy access to the hospital itself if hospitalization or the use of hospital facilities is required. In the case of hospitalized patients, it permits a closer contact between the patient and his private physician than would be possible if the physician's office was in a location remote from the hospital grounds. The availability of facilities is therefore in the public interest as well as in the interest of the hospital and the medical practitioners."

The judge concluded, however, that the office building was not a "hospital" within the meaning of § 301(6)(b) of the zoning ordinance because that term "has not yet evolved to include within its meaning a medical office building of the type proposed by [Baystate]." He concluded that the building would qualify for a special permit as an office for a "doctor, oral surgeon or dentist" under § 301(6)(d) of the zoning ordinance.[6] However, because the building was not in his opinion a hospital, he ruled that it was not exempt from the height restrictions of § 503. Baystate, thus, could construct a physicians' office

---

[6] Because § 201 of the ordinance provided that in construing the ordinance "[t]he singular shall include the plural, and the plural shall include the singular," the use of the singular in § 301(6)(d) did not, according to the judge, prevent the issuance of the special permit for multiple office use. Nor was issuance of the special permit affected, in his view, by a later amendment of that section.

building, but it could be no higher than two stories, or 35 feet. The judge remanded the case to the Springfield city council "for reconsideration . . . in order to assure that the proposed medical office building would not exceed the height requirements of the zoning ordinance unless authorized by a valid variance granted by the Board of Appeals." On remand, the city council amended the special permit to indicate that the proposed building could not exceed such height limitations in the zoning ordinance as were applicable. The city council noted in its vote, however, that it wished to preserve the special permit as originally granted. Thereafter, on the basis of the findings, judgment entered dismissing both actions on the merits. The hospital appealed.[7]

The sole issue is whether the proposed physicians' office building is a hospital, or part of a hospital, for purposes of the Springfield zoning ordinance. If it is to be so considered, the height restrictions of § 503 do not apply. We reach the conclusion that for zoning purposes the structure as proposed would be an integral part of Baystate, a hospital, and that it is not therefore, subject to the height limitations in § 503.

The term "hospital" is not defined in the zoning ordinance. "The meaning of the relevant, everyday terms used in the ordinance . . . is to be determined 'according to the common and approved usages of the language' [citations omitted]." *Jackson* v. *Building Inspector of Brockton*, 351 Mass. 472, 475 (1966). See *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham*, 382 Mass. 283, 290 (1981). Dictionary definitions of the word "hospital" are generally broad enough to include within its meaning an attached office building for medical staff. A "hospital" has been defined as "an institution or place where sick or injured persons are given medical or surgical care" (Webster's Third New International Dictionary 1093 [1971]), and as " [a]n institution or establishment for the care of the sick or wounded, or of those who require

---

[7] The appeal by the hospital appears to have been precautionary because of the content of the findings. The plaintiffs also filed a notice of appeal, but their appeal was dismissed in the Superior Court pursuant to Mass.R.A.P. 10(c), as appearing in 378 Mass. 938 (1979).

medical treatment" (The Compact Edition of the Oxford English Dictionary 1336 [1971] ). A zoning treatise is more specific as to medical offices in a hospital, defining a "hospital" as "an institution providing health services, primarily for in-patients, and medical or surgical care of the sick or injured, including as an integral part of the institution, such related facilities as laboratories, out-patient departments, training facilities, central service facilities, and staff offices." Anderson, American Law of Zoning § 16.11, at 53 (2d ed. 1977). There was undisputed testimony at trial that the term "hospital" as used generally in the profession of hospital administration includes within its scope a medical office building, connected to the main hospital building, for use of members of the hospital's medical staff.

The trial judge reasoned, correctly, that a hospital and professional office building are two different things.[8] The proposed building, looked at separately and apart from it surroundings, most certainly would not be a hospital for zoning purposes. As to that matter, we agree with the trial judge. The question, however, is not whether, standing alone, such a building could be considered a hospital but whether its relationship to a hospital is such that it is an integral part of a unified hospital facility.

There are numerous instances in which courts have looked at the whole project to determine the use for zoning purposes of a part of a project. For example, a structure used for dehydrating fodder material would ordinarily be viewed as a structure used for manufacturing. However, if the structure is "of a

---

[8] He relied, among other things, on a case from another jurisdiction which dealt with a proposed medical office building that had no physical or other connection with any hospital. Not surprisingly, the project was determined to be a professional office building and not a hospital. *Parker* v. *Rash*, 314 Ky. 609 (1951). The trial judge also relied on the definition of "hospital" in G. L. c. 111, § 52, as appearing in St. 1967, c. 891, § 2, which provides, for licensing purposes, that a hospital is "any institution, however named, whether conducted for charity or for profit, which is advertised, announced, established or maintained for the purpose of caring for persons admitted thereto for diagnosis, medical, surgical or restorative treatment which is rendered within said institution." He also noted a distinction between a hospital's regular staff members who are employees of the hospital and members of the medical staff who would have private offices in the proposed building. The latter would not necessarily be hospital employees.

character ordinarily and reasonably regarded as farming" and its use is directly related to the farming operations of the owner, it is regarded for zoning purposes as being used for farming. *Jackson* v. *Building Inspector of Brockton*, 351 Mass. at 476-477. Similarly, an electric generating and steam power plant, standing alone, would ordinarily constitute an industrial use for zoning purposes. However, when the power plant "would be an integral part of the institutional activities of [an association of institutions engaged in medical, educational, and charitable functions]," it could be found to be "an institutional facility," and the Boston Redevelopment Authority could properly grant a zoning variance allowing it to be built. *Boston Edison Co.* v. *Boston Redevelopment Authy.*, 374 Mass. 37, 65-70 (1977). In *Salah* v. *Board of Appeals of Canton*, 2 Mass. App. Ct. 488 (1974), this court held that a proposed complex which included warehouse space, a garage, and truck storage facilities and which was to be operated by a common carrier was not necessarily a trucking terminal for zoning purposes. Looking at the complex as a single entity, the court concluded that the use of the facility for the accumulation, storage and distribution of goods brought the complex "within the common and approved usage of the phrase 'distribution plant' and [was therefore] permitted by the [zoning] by-law . . . ." *Id.* at 494.[9] In *De Mott* v. *Notey*, 3 N.Y. 2d 116, 119 (1957), it was held that living accommodations provided for hospital personnel, it being customary for hospitals to provide such accommodations, were for zoning purposes to be regarded as part of a hospital facility and not a boarding house. See also *Broderick* v. *Board of Appeal of Boston*, 361 Mass. 472, 479 (1972).

In this case, Baystate owns the property to be developed. The proposed building would be connected physically to one of the hospital buildings. In his findings, the judge recognized

[9] Entitlement to a tax exemption as a charitable organization under G. L. c. 59, § 5, Third, involves different considerations. See *Milton Hosp. & Convalescent Home* v. *Assessors of Milton*, 360 Mass. 63 (1971) (private doctors' offices in hospital are not tax exempt); *Lynn Hosp.* v. *Assessors of Lynn*, 383 Mass. 14 (1981) (portion of hospital parking garage is not tax exempt). Compare *Children's Hosp. Medical Center* v. *Assessors of Boston*, 353 Mass. 35 (1967) (hospital laundry plant is tax exempt).

the significant benefits which would flow to the hospital, the patients, the physicians, and hospital trainees (interns and residents) from having medical office facilities close to the main facilities of the hospital. The undisputed evidence from expert witnesses at trial was that the large majority of hospitals have added medical office buildings to their hospital complexes within recent years. This trend, according to the expert witnesses, is related to the "revolution" in health care whereby in-patient use of facilities is decreasing while use of out-patient or ambulatory care facilities is expanding rapidly. We conclude, on these facts, that the proposed medical office building would be an integral part of the hospital.

In exempting hospitals from the height requirements, the legislative body which enacted the zoning ordinance must have intended to facilitate reasonable health-related projects undertaken by institutions, such as Baystate, which provide essential health services in populous areas. See *Broderick* v. *Board of Appeal of Boston*, 361 Mass. at 479. Thus, to the extent that the proposed building would benefit Baystate, an interpretation of the term "hospital" which is broad enough to include the proposed medical office building advances the purpose of the ordinance. Subjecting the project to the height restrictions of § 503, on the other hand, would serve no reasonable purpose. The building could be built, even if not within the exemption in § 503 for hospitals, but only to a height of two stories or thirty-five feet. If the height should be so restricted, the building would cover considerably more of the open space than would be covered under the plan. The majority of the major buildings in the hospital complex are already five stories high. Placing a five-story building among buildings of similar height results in no discordant massing or aesthetic incongruity. We note that neither the Springfield planning department nor the city council had any concerns about the height of the proposed structure.

Accordingly, the findings and conclusions on which the judgment was based, insofar as they state that the proposed project is not covered by § 301(6)(b) of the Springfield zoning ordinance and that it is subject to the height restrictions of

§ 503 of the zoning ordinance, are vacated. We direct the entry of a new judgment declaring that said height restrictions do not apply to the proposed project.

*So ordered.*