ARNOLD B. TOFIAS & another,[1] trustees, & another[2] vs.
WILLIAM C. BUTLER & others.[3]

No. 87-767.

Middlesex. March 16, 1988. — June 3, 1988.

Present: BROWN, KAPLAN, & WARNER, JJ.

*Zoning*, Building permit, Lot size, Split lots, Zone boundary, Zoning district, Height restriction.

On appeal to the Superior Court by the owner of a "split lot" lying partly within a city's "residential A-2" zoning district and partly within a "limited commercial" district, seeking reinstatement of a building permit which the board of appeals had revoked on the basis of its conclusion that, since the "footprint" of a proposed commercial structure, to be located entirely within the commercially-zoned portion of the lot, would cover more than twenty percent of that portion of the lot, it would exceed the lot coverage limitation prescribed by the zoning ordinance, the judge, noting that the ordinance prescribed the same maximum lot coverage percentages for both districts, correctly concluded that the entire lot, and not only that portion located in the commercial district, was to be taken into account in determining the maximum permissible footprint area and that, as so considered, the footprint did not exceed the prescribed limitation. [92-96]

With respect to a proposed commercial building of five levels, of which the two lower levels would serve for underground vehicular parking; the middle level would rise not more than four feet six inches above the average finished grade (and thus not be a "story" for purposes of the applicable zoning ordinance); and the two upper levels (which would be "stories") would not, with the middle level, exceed thirty-five feet in height, a Superior Court judge correctly concluded that the building complied with the height limitations of the ordinance, which prohibited buildings exceeding two stories or thirty-five feet in height, whichever is less. [97]

---

[1] Donald Tofias, both as trustees of Reservoir Place Realty Trust.

[2] The superintendent of public buildings of Waltham (building inspector).

[3] Louise I. Butler, his wife, and the zoning board of appeals of Waltham.

CIVIL ACTION commenced in the Superior Court Department on May 20, 1986.

The case was heard by *Elbert Tuttle*, J., and a motion for a new trial was heard by him.

*Stanley J. Chlapowski* for William C. Butler & another.

*Richard W. Renahan* for the plaintiffs.

*Robert F. Pilicy*, Assistant City Solicitor, for the Superintendent of Public Buildings of Waltham.

KAPLAN, J. The locus is 34.372 acres of land west of and contiguous to Route 128 and north of and contiguous to Trapelo Road, Waltham, now owned by the Tofiases as trustees of the Reservoir Place Realty Trust (Trust I). The land was assembled thus. In September, 1981, the trustees bought the lot at 1601 Trapelo Road, a panhandle-shaped tract with a ground area of 11.5 acres, improved by a commercial building originally called "Tracerlab." A north-south line, with land to the west zoned "residential A-2" and land to the east zoned "limited commercial," transected lot 1601 close to its long border, the larger area of the lot lying in the limited commercial district. In December, 1983, the trustees bought lot 1601-rear, a vacant lot on the long border of 1601, with a ground area of 14.77 acres, lying entirely in the residential A-2 district.[4] In December, 1984, the Tofiases bought lot 1605, adjacent to 1601 on its northerly side fitting under its handle, and entirely in the limited commercial district; it had a ground area of 8.1 acres and was improved by a commercial building called "Pitney-Bowes." Lot 1605 was taken in the name of Reservoir Place Realty Trust II (Trust II).

On July 2, 1985, the Waltham building inspector issued a building permit to the trustees. They proposed to raze the existing building on lot 1605 and construct a new building or addition there, connecting with the building on 1601 (previously refashioned) to form a single structure placed altogether in the limited commercial district. The permit issued upon the understanding that the three lots would be brought into single

---

[4] At its northerly end, a small portion of this lot (.84 acres) lay in Lexington. See note 7, *infra*.

ownership as a single lot; otherwise an occupancy permit would not be granted. The consolidation was accomplished in March, 1986, by means of a conveyance from Trust II to Trust I.[5] Demolition started in October, 1985, and construction, commencing in November, was carried on continuously thereafter.

The Butlers, who owned one of the residences on the rim of former lot 1601-rear, all in the residential A-2 zone, after a futile correspondence with the building inspector in January, 1986, filed an appeal with the zoning board of appeals of Waltham (Board) on February 27, 1986, demanding revocation of the building permit issued to the trustees. They complained about "lot coverage." The "footprint" of the consolidated structure amounted to 5.21 acres or 226,850 square feet. This was 29.26% of so much of the ground area of the single lot as lay in the limited commercial district, amounting to 775,057 square feet. But, said the Butlers, the Waltham zoning ordinance prescribes, for that district, that the footprint not exceed 20% of the ground area of a lot.

The Board, after hearing, in its decision of May 15, 1986, agreed with the Butlers about lot coverage and added that, in their view, the height of the structure built on former lot 1605 exceeded the height allowed by the ordinance. (The Board added other objections which have since disappeared from the case.)[6]

On appeal by the trustees to the Superior Court, a judge of that court, after trial, held for the trustees on both points, and

---

[5] It was not exceptional for the building inspector to undertake to issue a building permit for a single lot with the understanding that the constituent lots would be consolidated.

[6] The Board in its decision postponed revocation of the building permit until June 30, 1986, to permit the trustees to seek judicial review, or a variance or modification by the Board, or a zoning change. The trustees filed their appeal in the Superior Court, moved for speedy trial, which was allowed, and, on June 26, 1986, secured an injunction staying the revocation of the building permit pending decision of the case.

The trustees did not halt the construction at any point. One of the trustees testified that they believed the Board was in error; they had an agreement with the Pitney-Bowes people to relocate them into the new addition; and had contracted for the delivery of most of the construction materials according to a schedule which could be interrupted only with loss of efficiency.

annulled the Board's decision and affirmed the issuance of the permit. He held, in effect, that, in determining the ratio of footprint to ground area, the building inspector could take into account the entire single lot, including the area, 685,677 square feet, located in the residential A-2 district. This would yield a percentage of 15.5%.[7] He noted that the ordinance provided the same percentage, 20%, as the maximum ratio of footprint to ground area for buildings in the residential A-2 district.[8] And the judge held that the height limit for the new structure in the limited commercial district had not been passed. On both points, the judge ruled in effect that the Board had committed errors of law, and had thus acted arbitrarily. The Butlers appeal to this court.[9]

1. *Lot coverage.* Zoning ordinances in municipalities around the country have tried by various formulas, and not with outstanding success, to meet the peculiar and often unanticipated problems arising in the management of "split lots" — single lots extending over two or more zoning districts.[10] The Waltham

---

[7] The total ground area of the single lot is taken as 775,057 + 685,677 = 1,460,734 square feet. This excludes .84 acres located in Lexington (see n.4). It includes about two acres of a road, "Tracer Lane," which runs inside and along the easterly border of the lot. This part of the land is owned by the trustees, but is subject to use by others. The 15.5% rises to 16.5% if the two acres are excluded from the total ground area in the calculation.

[8] Article VI, § 2B, of the ordinance, "Percentage of Lot Coverage" for residence A-2 reads: "All buildings, including accessory buildings, shall not cover more than twenty (20) percent of the area of the lot." The provision for limited commercial is the same except that "tract" appears instead of "lot." Art. XII, § 2(B) (first sentence). We do not find the difference significant.

[9] The Butlers are appellants. The trustees and the building inspector are appellees and have filed a single brief. At the close of trial, the Board moved for a new trial on substantive grounds. This was denied. The Board has taken no further part in the case. (The Butlers purport to appeal from denial of the motion for new trial as well as from the judgment, but this is not material.)

[10] See 2 Anderson, American Law of Zoning 3d § 9.12 (1986); Annotation, Validity and Construction of Zoning Regulation Respecting Permissible Use as Affected by Division of Lot or Parcel by Zone Boundary Line, 58 A.L.R. 3d 1241 (1974).

ordinance has a provision for "Lots in Two Districts" which, whatever may be its exact meaning in relation to lot coverage, is of the grandfathering type and is static and narrow in scope.[11] We do not read it as intended to constitute an exclusive rule, and so we are remitted to more general considerations and must pursue the case law.

In *Brookline* v. *Co-Ray Realty Co.*, 326 Mass. 206 (1950), the defendant owned a lot of which some 15,000 square feet lay in Boston and 5,000 in Brookline. The defendant intended to construct an apartment building in Boston, and depended on portions of the vacant area in Brookline to piece out the spaces required by the Boston ordinance for rear yards. These yards would be used as service entrances for segments of the apartment building. Brookline sued for an injunction, pointing out that the Brookline area was zoned as a single-residence district, and the intended use to be made of the area would violate the Brookline by-law governing such a district. Brookline prevailed in the action.

In the case of *Tambone* v. *Board of Appeal of Stoneham*, 348 Mass. 359 (1965), the owner had a lot in Stoneham straddling a line which divided a "Residence B" district — apartment building permitted — from a "Residence A" district — apartment building prohibited. The owner proposed to put his apartment building in his B area at a safe distance of sixty-two feet of vacant land from his lot line in order to satisfy a thirty foot side yard requirement. When the owner applied for an exception to permit parking in the side yard, the board of appeals held the side yard itself to be improper because the sixty-two feet were transected by the district boundary line leaving only twelve feet in B and the rest in A. Reversing the board, the court

---

[11] "Where a district boundary line divides a lot in single or joint ownership of record into different districts at the time such line is adopted, the regulations for the less restricted portion of such lot shall extend not more than thirty (30) feet into the more restricted portion, provided that the lot is still owned by the owner of record of such lot when such line was established, and provided further that the lot has frontage in the less restricted district." Art. V, § 1(c).

The building inspector believed that this provision dealt with cases where the structure itself passed over the line.

held that where Stoneham set "minimum yard requirements" it meant a measurement in relation to the lot line and not, as the board had supposed, the district boundary line. The question whether parking was to be allowed was a quite separate matter.

The *Tambone* opinion did not cite *Co-Ray*. The cases stand together consistently. In *Co-Ray*, Brookline was not attacking the side yard measurements to the lot line in Brookline, but rather the active uses to which the yards were to be put. As the court said, "Brookline is seeking neither to enforce the Boston zoning regulations nor to deny the use of the Brookline land as a source of light and air to the Boston land. It is not objecting to the mere presence of concrete walks on the ground. What the town seeks to enforce is its own zoning by-law and the ban therein against the use of the Brookline land as a locus for carrying on the numerous inevitable service activities accompanying the occupancy of an apartment house." 326 Mass. at 212. (That Brookline as a separate municipality was in court insisting on its own policy added emphasis to its case.) Similarly, the *Tambone* court, in explaining the meaning of "yard," was saying implicitly that there was nothing wrong with the "abstract"[12] filling out of the thirty-foot requirement by reference to the A area within the owner's lot. However, when it came to the question what activities — there parking — could properly be carried on in the space, other considerations entered.

In a perhaps deeper sense, one can say that the use made of the area in the more restricted district to supply space for a yard or the like is, in itself, a use not inconsistent with the requirements of such a district.

Subsequent authority found in the Commonwealth conforms with the analysis. Suppose, as in *Harrison* v. *Building Inspector of Braintree*, 350 Mass. 559 (1966), the owner of a split lot proposes to lay down an access roadway in the "residential" part of his property to reach his factory in the "industrial" part. The project must be abandoned (short of some affirmative municipal action to legalize the access), for "[t]he use of land in

---

[12] We borrow the word "abstract" from the case of *Byrne* v. *Perry*, cited below in our text.

a residential district, in which all aspects of industry are barred, for access roadways for an adjacent industrial plant violates the residential requirement." 350 Mass. at 561 (citing the *Co-Ray* case and other authority). This was not an abstract staking out of land, but an active, prohibited use of it. See also *Richardson* v. *Zoning Board of Appeals of Framingham*, 351 Mass. 375, 381 (1966); *Building Inspector of Dennis* v. *Harney*, 2 Mass. App. Ct. 584, 585-586 (1974). Cf. *Dover Pool & Racquet Club, Inc.* v. *Brooking*, 366 Mass. 629, 633 (1975).[13] In contrast, we have to mention the suggestive case of *Byrne* v. *Perry*, 12 Mass. App. Ct. 883 (1981), where the parties by agreement "formed a residential building lot by adding to a parcel of unrestricted land a portion of the land designated in [their] agreement as the 'Green Belt,'" which was to be "forever left as an open area in its natural state." The defendant built on the unrestricted land, counting on part of the Green Belt to meet the "dimensional requirements" of the zoning by-law. The plaintiff claimed a violation of the agreement. In the court's view the agreement prohibited "construction on or other physical alteration of the Green Belt" (except as specifically allowed in the agreement), but it did not prohibit the "abstract uses" of that land to satisfy the by-law.

Also instructive are the holding and discussion in *Forest City, Inc.* v. *Payson*, 239 A.2d 167 (Me. 1968), permitting the use of a more restricted area to supply the rear yard requirement for a building in the less restricted zone. The opinion considers similar authority in Maryland, *Hutzler* v. *Baltimore*, 207 Md. 424 (1955), and *Roland Park Civic League* v. *Lanco, Inc.*, 238 Md. 3 (1965). A very recent decision, *Ciocon* v. *Planning Bd. of the Borough of Franklin Lakes*, 223 N.J. Super. 199 (1988), takes a like view upon a studied examination of our *Co-Ray* and *Tambone* cases.

---

[13] Nevertheless, an occasional case, although acknowledging that "use of the strip [in the residential district] for business access to other land is business use," discovered a basis for providing "relief from the literal operation of the zoning ordinance," where access was important and would not in fact impair the quality of the area to be traversed. See *Lapenas* v. *Zoning Board of Appeals of Brockton*, 352 Mass. 530, 532, 533 (1967). Compare *Chelmsford* v. *Byrne*, 6 Mass. App. Ct. 848 (1978).

We conclude that the trial judge's decision of the lot coverage point — that the calculation could run to the lot line and need not stop at the district boundary line — was correct, and strengthened by the fact of the equivalence of the lot coverage percentages in the two districts. In split-lot decisions of this character, we see (to quote from the *Forest City* case) efforts at "a compromise between the ordinance's apparent recognition of the value of regular zone boundaries and a desire to permit land owners to enjoy the use of their entire properties as single units." 239 A.2d at 169. In such a compromise, there is reason to be wary to protect the interests of landowners in the periphery of the lot at issue, here the Butlers and other homeowners in the residence A-2 district who border on the lot. In that connection the building inspector was asked at trial: assuming the residential part of the lot could figure in the calculation of lot coverage, could any houses later be built in that residential area? The answer was, "I would say no." In their brief the trustees and building inspector say, referring to that colloquy, that "to the extent required to satisfy the dimensional requirements, such residential land cannot be subsequently built on or counted towards the lot coverage requirement of another structure, but rather must be left as open space . . .. Thus, the result . . . is to leave the land open, a degree of use less intensive than the residential development permitted by the zoning ordinance." This is right on principle and looks to a duty cast on the trustees to maintain an open, unbuildable area en bloc in the residential part of the lot at least large enough to fill out the ordinance quota.[14]

---

[14] In furtherance of the principle, we think the two-acre Tracer Lane area should be excluded from the calculation, thus enlarging the obligatory open space in the residential area.

It may be said on behalf of the homeowners that, had the trustees been confined to a construction satisfying the 20% maximum in relation only to the limited commercial area included in the lot, the resulting building would have been smaller than the current building and its utilization presumably less burdensome to the neighborhood. With this consideration in mind, the trustees may wish to oblige themselves to provide the open area to the limit of

Tofias *v.* Butler.

2. *Height.* The new structure (on former lot 1605) has five levels of which the two lowest serve for underground parking. The middle level rises no more than four feet, six inches, above the average finished grade (and thus, according to the ordinance definition, is not a "story"), and these four and one-half feet plus the height of the two higher levels (which are "stories") do not exceed thirty-five feet. We agree with the judge's conclusion that, as to height, the building complies with the ordinance, which states that buildings may not be erected to a height in excess of two stories or thirty-five feet, whichever is less.[15]

Evidently the land sloped downward, south to north, from the existing building through the location of the new building. Fill was used up to five or six feet at the southerly end of the new building and to some twenty-two feet at its northerly end, creating the average finished grade above mentioned. We find nothing in the ordinance that prohibits this use of fill. (The judge, upon taking a view sometime before completion, saw nothing egregious in prospect.) The total effect is that the ground and roof of the new structure are approximately even with those of the existing building. The Butlers raise questions about how deep, under the by-law as now written, a building could go, and how steep a backfill, but those questions we need not answer.

The case is remanded to the Superior Court for the entry of a judgment which shall (1) annul the Board's decision and

the lot and perhaps to furnish simple landscaping amenities. (Of course the Waltham city council, if it chooses to deal with split lots by means of amendment of the ordinance, may regulate all these matters or install a procedure for handling them.)

[15] For a limited commercial district, art. XII, § 2(C), states: "Building Height Limit. No building, including accessory buildings, shall be erected to a height in excess of two (2) stories or thirty-five (35) feet, whichever is less . . ." "Height of Building" is defined by art. III, § 3, as "[t]he vertical distance above the mean finished grade of the ground adjoining the building to the highest point of the roof . . ." And "Story" is defined as "[t]hat part of a building between any floor and the floor or roof next above . . .. A basement or cellar, the ceiling of which extends more than four (4) feet, six (6) inches above the average finished grade, shall be a story within the meaning of this Chapter."

affirm the issuance of the building permit, (2) describe the unbuildable space in the residential area (see point 1 and first paragraph of n.14), and (3) may include further provisions consented to by the trustees (see second paragraph of n.14). The judge of the Superior Court may conduct any hearing he or she deems desirable in connection with formulating the judgment.

*So ordered.*