Billings, A.J.
This is an abutter’s appeal under G.L.c. 40B, §17 from the refusal of the building inspector of the Town of Billerica, affirmed by an evenly divided Board of Appeals, to halt construction of a home on two adjoining and nonconforming lots. The case was tried jury-waived in two trial days on January 22-23,2003. The issue is whether the Building Inspector properly permitted a “reconstruction” of an earlier structure located on one of the two nonconforming lots. It turns on the application of various provisions of the Billerica Zoning Bylaw to the facts of the case.
For the reasons that follow, I hold that the permit was not properly issued and that the cease and desist order requested by the plaintiff should have been granted. The case is remanded to the Board of Appeals for further proceedings consistent with this opinion.
FINDINGS OF FACT
A. The Parcels
The neighborhood in question was once known as “Nuttings Lake Park.” A developer’s map dated 1910, 35 years before Billerica passed its first zoning bylaw, shows hundreds of tiny, neatly laid-out lots and streets to serve them, on and away from the north shore of Nuttings Lake. The typical lot is rectangular in shape, 25 by 100 feet, but necessarily (because the subdivision is bounded by an irregularly shaped lakeshore), many lots — including those at issue in this case — are less regular in shape, and larger or smaller in size.
The property in question is a combination of what once were four lots in Nuttings Lake Park. They were, from east to west, 375A, 375, 374A, and 374. All four front on Massachusetts Avenue; 375A is on the comer of Massachusetts Avenue and Cherry Street, and so has frontage on both. All four are separated from Nuttings Lake by a single row of lakefront lots, and Massachusetts Avenue. They lie within what presently is Billerica’s Village Residential district.
*569 Evidently, many of the original, 2500 square foot (more or less) lots in Nuttings Lake Park were combined, either on original sale or later. In any event, at some point prior to 1945:
What were the developer’s lot nos. 375A and 375 came into common ownership as what is called, on today’s Assessors’ maps, Parcel 28-2. It is 2,733 square feet in area.
What were once lots 374A and 374 came into common ownership (by a different owner), and are now called Parcel 28-4. This lot is 3,627 square feet in area, and adjoins Parcel 28-2.
A copy of the pertinent portion of the Assessors’ maps, showing the locus (Trial Ex. 1, Tab 2), is attached as Appendix A.*
Lots 28-2 and 28-4 constitute the subject property. They did not come into common ownership with each other, however, until 1978. In that year William B. Callison, who (with his wife) had purchased Lot 28-4 and numerous nearby lots in 1970, added Lot 28-2 to his holdings.
Those holdings came into the Coneeny family in a series of transactions in the 1990s.
On January 27, 1995 Callison conveyed Lots 372 and 373 (Assessor’s Parcel 28-5) to Edward Con-eeny. On this land, Coneeny built what is now the plaintiffs home, which she purchased from him.
Also on January 27, 1995, Callison also conveyed to Coneeny Lots 273, 273A, 274, 274A, 275, 276, 277, and 278, none of which are involved in this litigation.
The same day, Callison conveyed lots 374 and 374A (Assessors’ Parcel 28-4) to Coneeny’s daughter, Angela Culot.[2] Because Callison retained Lot 28-2, the two parcels that are the subject of this litigation now passed back out of common ownership.
Finally, on September 10, 1998 Callison’s executors conveyed lots 375 and 375A (Assessors’ Parcel 28-2) to Coneeny.
It appears that Coneeny thereafter conveyed Parcel 28-2 to the Bear Hill Really Trust, of which he is one of two trustees.
Five days before trial began, on January 17, 2003, Culot conveyed Lot 28-4 to Coneeny and Kathleen Bavis, as Trustees of the Bear Hill Realty Trust. The two lots at this point — long after the house on them was erected— now passed back into common ownership.
The chain of title to both lots (so far as can he gleaned from the evidence at trial) is summarized in Appendix B to this opinion.
The plaintiffs home, as noted above, is located on Assessors’ Parcel 28-5 (formerly lots 372 and 373). Her lot abuts (i.e., shares what is technically a side lot line with) both 28-2 and 28-4. From the rear windows of her house, she looks out on the back of the Coneeny house that is the subject of this litigation.
B. The “Cottage”
Until the defendants constructed the home that is the subject of the present dispute, Lot 28-4 was unimproved. Lot 28-2, on the other hand, had once supported a structure, long since gone and variously described in testimony and documents as a “camp,” a “shack,” a “cottage,” a “dwelling,” or a “house.” It lay in the corner of Massachusetts Avenue and Cherry Street, very close to both. Precisely how close does not appear, but an old Assessors’ map, if assumed to be approximately to scale, suggests about five to ten feet.
Although perhaps not quite “of clay and wattles made,” the structure was by all accounts quite rustic. The Court heard the testimony of Mrs. Mary Roseburg, a near neighbor and eyewitness who, shortly after she moved into the neighborhood in 1961, accepted the then owner’s (Mr. Callisoris) invitation to tour the structure. She described a one-room structure with no running water, no heat, no electricity, no bathroom (chamberpots substituting therefor), and — it was clear — little beauty or charm, at least in the eyes of this beholder. This was the only time she ventured inside.
An Assessors’ file card from 1946 generally, if not totally, corroborates Mrs. Roseburg’s testimony: it describes a single-story, three-room, 556 square foot “cottage,” sitting on piers in lieu of a foundation, shingle-sided, uninsulated, without benefit of heat, fireplace, running water, or bathroom (although the records can also be read as reflecting, somewhat inconsistently with the notation “NO WATER,” some sort of “W/C unit” and a cesspool). Age was indeterminate; condition and location were “fair;” replacement value, $903; actual value, $542.
According to Mrs. Roseburg’s testimony, the structure was used (during the time she lived there) only seasonally, and only for short visits during daylight hours. It appears likely that in earlier days, its use might have included overnight, but still seasonal, visits, but highly unlikely that it was ever used as a primary residence.
A July 12, 1979 letter in the Assessors’ file from Mr. Callison, the owner at the time of lot 28-4 and the “cottage,” documents the structure’s demolition and conveys some idea of its deteriorated condition.
On the night of 3 July 1979 some vandals entered the house located on the comer of Cherry Road and Mass Ave Lot 375-375A and for some unknown reason pushed the right wall of the house which was in a rotten condition out so that it fell, at the same time the roof caved in. I did not call the police because the house was not insured and was of no real value as it had no betterments. For the safety of the children in this area and for my own protection, I had to tear down the rest of the house.
The letter closes by requesting that the property— then assessed at land, $150; buildings, $600 — be *570 reassessed as vacant. This was done, and the property given a new valuation of $150.
Lot 28-2 thereafter remained vacant, and lot 28-4 (as previously noted) was always vacant, until the summer of 2000.
C. Prior Administrative and Litigation History .
In the last eight years, the owners of Lots 28-2 and 28-4[3] have made numerous attempts to obtain the zoning approvals needed to develop them, of which at least a summary understanding is useful background to the present proceeding.
In 1995, the owners sought a variance to combine the two lots into one, and to build on it. The ZBA denied the variance by a 3-2 vote. The decision was appealed to this Court in Civil Action no. 95-6186, the owners asserting that they were entitled to grandfathered status; if not the zoning bylaw was unconstitutional as applied; and in any event, the ZBA’s denial was arbitrary, capricious, and contrary to law.
In 1998, with the 1995 case still pending, the owners sought a determination by the building inspector that the lots, or else the larger lot created by combining them, were grandfathered. They were declined and appealed to the ZBA, which voted 5-0 to uphold the Building Inspector. This decision, too, was appealed to this Court as Civil Action no. 98-3685, in which (as before) both traditional zoning and constitutional arguments were again advanced.
The 1995 and 1998 cases were consolidated. On April 28, 1999, the Court (Hillman, J.) entered summary judgment against the owners on all but the constitutional claims. The Court held, among other things, that although the bylaw and c. 40A, §6 permitted grandfathering of lots at least 5,000 square feet in area, “there is certainly nothing in statutory or case law suggesting that [property owners] would have the right to combine undersized lots for the purpose of satisfying the minimum cut-off for grandfathering” (i.e., the requirements in c. 40A, §6, fourth paragraph that a grandfathered lot have at least 5,000 square feet of area and 50 feet of frontage). This legal issue is discussed further below.
The owners successfully moved to bifurcate the cases and stay resolution of the constitutional claims so that the summary judgment decision could be tested on appeal. While the appeal was pending, however, the owners and the Town reached an understanding which, in effect forms the basis of this case.[4] That understanding was that the owners — having now acquired Parcel 28-2 from the Callison estate — would be permitted to combine this with the adjoining Parcel 28-4 and, on the combined, 6,360 square foot piece, to “reconstruct” the old cottage tom down in 1979 pursuant to Section 11 .E of the bylaw and c. 40A, §6, first paragraph.
Events now began to move fairly rapidly. The Building Inspector issued a foundation permit on April 5, 2000. Two days later, the 1995 and 1998 cases were dismissed voluntarily. Work on the foundation began in August.
The plaintiff — who had not been a party to the 1995 case, the 1998 case, or the settlement agreement disposing of them, and had not known of the issuance of the foundation permit — came home from work one day to find heavy equipment and a large hole between her rear lot line and Massachusetts Avenue. She promptly sought a cease and desist order from the Building Inspector, and was denied. She appealed this decision to the ZBA.
Meanwhile, the foundation was completed, the Building Inspector issued a building permit on September 7, and the owners began framing. Now, the plaintiff entered the litigation fray. On September 18, she filed a three-count complaint asserting claims for breach of contract, fraud, and nuisance, and seeking injunctive relief. Her request for preliminary injunction was denied on September 25 (Lauriat, J.), on the ground that the plaintiffs “view has already been obstructed, and thus an injunction against further construction would not achieve her desired relief.” The decision ended on a cautionary note:
However, as the court made clear to defendants’ counsel at the hearing, should the plaintiff ultimately prevail in this action, or in her efforts to overturn the building permit issued to the defendants by the Town of Billerica, the plaintiff may request, and the court has the authority to order, the removal of the defendants’ building. Thus, the defendants’ continued construction of the building at 22 Massachusetts Avenue pending the outcome of this action, as well as the appeal to the Billerica Zoning Board of Appeal, is being done at their own financial peril, and with fair notice that a court may ultimately order the defendants’ building removed from that location.
On October 6, 2000 the ZBA voted on the plaintiffs appeal from the Building Inspector’s refusal to halt construction. The Board split 2-2, and so the appeal was denied. The decision was filed with the Town Clerk on November 20, 2000, and the plaintiff timely filed this enforcement action on December 1, 2000. Her request for preliminary injunction was denied on December 14, 2000 (Haggerty, J.) on grounds similar to those supporting Judge Lauriat’s decision: “(T]he plaintiff has failed to sustain her burden of demonstrating irreparable harm. The house on the subject property is nearly finished.”
D. The Coneeny House
The house constructed on lots 28-2 and 28-4 in fact straddles the lot line between them, a fact whose legal consequences are discussed below. If one were to treat the combined lots as a single, 6,360 square foot lot then the house would have setbacks of 21.9 feet from Massachusetts Avenue, substantially more than this from Cherry Street, 12.5 feet from the lot line shared with the plaintiff, and 26.5 feet from the other side lot line. The location of the house on the lot is more clearly shown on Trial Exhibit 1, Tab 19 (Appendix C hereto) .*
*571 The house consists of a' basement and garage enclosed by the concrete foundation; a first floor; a second floor; and a half-stoiy attic. The top of the basement-garage level is approximately 7.3 feet above the mean elevation around it.[5] Photos in evidence (especially Trial Ex. 11 and 18) show that the floor of the garage portion— which has an overhead door and a side door opening to the outside — is at or slightly above ground level. See 780 C.M.R. §3603.5.3 (garage floor “shall be sloped to facilitate drainage toward the main vehicle entiy/exit doorway”). It appears clearly from the photos (including the placement of basement windows; see Trial Ex. 18) that the basement ceiling and the garage ceiling are at the same elevation. I infer, and therefore find, that the “basement” as well as the garage lies almost entirely above grade, the aesthetic effect for the homeowner or occupant being mitigated somewhat by a split-level front entrance. I further find that the 7.3 feet that lies above grade is substantially greater than half the height of this story. The entire structure is approximately 30.7 feet tall, again using mean grade.
The house stands on a footprint of 23 by 34 feet. As such, it is both taller and wider than the plaintiffs house. Photos in evidence corroborate the plaintiffs testimony, that while she once had a substantially unobstructed view from her home to Nuttings Lake, that view is now almost entirely obstructed by the Coneeny house.
E. The Billerica Zoning Bylaw
Billerica enacted its first zoning bylaw in 1945, long after the “cottage” was built and long before it was demolished. This first bylaw required, for a single-family residence in a residential district, a lot size of 7,500 square feet, frontage of 75 feet, and setbacks of 20 feet (front) and 7V2 feet (sides and rear).
As elsewhere, zoning in Billerica has evolved over the decades since its first enactment. The primary focus in this case is on the bylaw as amended through the May 2000 annual meeting, although issues relating to prior nonconforming use necessitates occasional reference to earlier bylaws, and equitable considerations require consideration of substantial changes enacted in 2001.
1. The 2000 Bylaw
Section 11 of the 2000 Bylaw, titled “NON-CONFORMING USES,” reads in pertinent part as follows:
A. Any lawfully non-conforming building or structure and any lawfully non-conforming use of a building or land may be continued in the same kind and manner and to the same extent as at the time it became non-conforming.
B. If any non-conforming building or use of a building or land be at any time discontinued for a period of two (2) years or more, or if such use or building be changed to one conforming with the Billerica Zoning By-Law in the district in which it is located, it shall thereafter conform.
D. No extension or alteration of a pre-existing nonconforming use or structure shall be permitted unless there is a finding by the SPGA [Special Permit Granting Authority] that such change, extension, or alteration is not substantially more detrimental to the neighborhood than the existing nonconforming use or structure.
E. Residential Dwellings — Single or two-family dwelling maybe altered, reconstructed, extended or structurally changed if it does not increase the existing non-conforming nature of the structure.
Other pertinent provisions in the 2000 bylaw include the following:
7.1 .A required setbacks of 35 feet in front, 20 feet in back, and 15 feet on sides,
PROVIDED, however, that on each lot in existence when the Zoning By-Law allowed an open side yard space of not less than seven and one-half (7V2) feet and which have (sic) less than one hundred twenty-five (125) feet frontage there shall provided (sic) an open yard space of not less than seven and one-half (7 V2) feet along each side property line; provided further, that on each lot in existence when the Zoning By-Law allowed a front open yard space of twenty (20) feet depth along the lot lines that bound streets, there shall be provided an open yard space of not less than twenty (20) feet depth along said street property lines . . .
Section 8.1 provides that in Residence Districts “dwellings shall not exceed two and one-half (21/2) stories or thirty-five (35) feet in height.” A “story” is defined in section 2.48 as:
That portion of a building contained between any floor and the floor or roof next above it, but not including either the lowest portion so contained if more than one-half of such portion vertically is below the mean finished grade as defined in the State Building Code of the ground adjoining such building, or the uppermost portion so contained if under a sloping roof and not designed or intended to be used for human occupancy.
A “half story” is defined in section 2.49:
A story directly under a sloping roof in which the points of intersection of the bottom of the rafters and the interior faces of the walls are less than three feet above the floor level on at least two exterior walls.
Finally, section 9 establishes the current minimum lot size in the “village residence” district of 30,000 square feet, and minimum frontage and depth of 120 feet each.
2. Changes in 2001
The 2001 annual town meetings (spring and fall) substantially overhauled the zoning bylaw. Section 11, “NON-CONFORMING USES,” was reconstituted as new Section 10, “NON-CONFORMING USES, BUILDING (sic), AND STRUCTURES.” Insofar as it may po *572 tentially affect the lots and structure at issue here, the new Section 10 reads as follows:
C. ALTERATION, RECONSTRUCTION, EXTENSION, ORSTRUCTURAL CHANGE TO A SINGLE OR TWO-FAMILY DWELLING
1. Any alteration, reconstruction, extension, or structural change to a single or two-family dwelling shall be permitted by right without increasing the nonconforming nature of such dwelling, so long as:
a. The dwelling is located on a lot of 5,000 square feet or greater;
b. In the case of a proposed alteration, extension, or structural change, the proposal complies with the yard requirements in effect at the time the dwelling was constructed, but in no case shall the width of a side or rear yard be less than 7 feet and in no case shall the width of a front yard be less than 20 feet, notwithstanding the non-compliance of the lot with area and frontage requirements;
c. In the case of reconstruction, such reconstruction complies with the requirements of a. and b. above;
d. In the case of reconstruction that does not meet the requirements of a. and b. above, such reconstruction may take place if it is within the same footprint as the pre-existing, nonconforming dwelling and does not increase the height and bulk of the pre-existing, nonconforming dwelling.
2. Any alteration, reconstruction, extension, or structural change of a pre-existing, nonconforming single or two-family dwelling that does not satisfy conditions l.a., l.b., l.c., and l.d. shall not be permitted by right, unless there is a determination by the Permit Granting Authority that such extension, alteration, or reconstruction does not increase the nonconforming nature of the dwelling.
3. Any alteration, reconstruction, extension, or structural change of a pre-existing, nonconforming single or two-family dwelling that increases the nonconforming nature of the dwelling shall not be permitted, unless there is a finding by the Permit Granting Authority that such alteration, reconstruction, extension, or structural change is not substantially more detrimental to the neighborhood than the pre-existing, nonconforming dwelling.
E. ABANDONMENT, DISCONTINUANCE, AND NON-USE
1. Any pre-existing, nonconforming building, structure or use that is abandoned, discontinued, or not used for a period of two or more years shall comply with all provisions of this Zoning By-law. This provision shall not apply to single or two family dwellings on lots 5,000 square feet or greater. Any abandoned, discontinued, or not used single or two family dwelling shall comply with the provisions of Section C, as set forth above.
DISCUSSION A. Standing
The defense begins with a challenge to the plaintiffs standing to challenge the budding inspector’s refusal to issue a cease and desist order. To appeal to the Board of Appeals, and to further appeal to this Court, the plaintiff must have been a “person aggrieved" by the building inspector’s failure to issue the cease and desist order she requested of him. Green v. Board of Appeals of Provincetown, 404 Mass. 571, 572-74 (1989). As an abutter, the plaintiff enjoys a rebuttable presumption that she was aggrieved by the building inspector’s decision. Marashlian v. Zoning Board of Appeals of Newburyport, 421 Mass. 719, 721 (1996); Chambers v. Building Inspector of Peabody, 40 Mass.App.Ct. 762, 768 (1996); Barvenik v. Aldermen of Newton, 33 Mass.App.Ct. 129, 131 (1992). The defendants having challenged her standing, however, the plaintiff bears the burden of proving that the construction of the Coneeny house, pursuant to the permits issued by the building inspector and his refusal to issue the requested order to cease and desist, caused injuiy to her legal rights that is “different from the concerns of the community at large.” Chambers.
That said, the plaintiff plainly does have standing. See Tsagronis v. Board of Appeals of Wareham, 33 Mass.App.Ct. 55, 58-59 (1992) (abutters had standing to challenge variance permitting construction of house on undersized lot; house would block abutters’ water view, thereby diminishing value of their property). “The plaintiff may assert a legal interest in preventing further construction in a district in which the existing development is already more dense than the applicable zoning regulation allows; it does not matter that the plaintiffl’s] own use is similarly nonconforming.” Id.
B. The Merits
Turning, then, to the merits of the dispute: the following discussion will focus, first, on the legality of the construction under the bylaw in existence at the time, i.e., the 2000 bylaw. Then, it will turn to the legality of the construction if the permitting process were begun today, which bears on the defendants’ argument that the case is moot and also on the issue of what relief is appropriate.
1. Legality Under 2000 Bylaw
The building inspector explained his decision to permit construction of the Coneeny house as follows. First he reasoned that because Parcel 28-2, at 2600 square feet, did not qualify as a grandfathered lot, grandfathering was “irrelevant” to the determination before him, meaning that if the lot were to be built upon, it would have to be as a reconstruction. He verified, principally from the Assessors’ files, that there had been a structure on Parcel 28-2 (the “cottage”), which might be reconstructed. He determined that the cottage had been habitable,[6] and therefore qualified as a single family dwelling for purposes of Section ll.E, governing reconstructions, and that it had been nonconforming in that it was closer to *573 Massachusetts Avenue and to Cherry Street than the minimum front yard setbacks permitted by the current bylaw for new lots (35 feet) or even for preexisting lots (20 feet). He therefore, relying on Section ll.E, determined that the “cottage” could be reconstructed on the property, provided the reconstruction did not increase its existing nonconforming nature.
On this last point the building inspector considered two existing nonconformities: the cottage had been closer to the road, and the lot was smaller, than currently permitted. The first nonconformity was mitigated by placing the house farther away from the road — even farther, in fact, than the 20 feet that Section 7.1A would require on a grandfathered lot, while still maintaining at least the 7 Vi feet that section would require on the side lot line that this lot shares with the plaintiffs. As for lot area: the reconstruction did not make the lot any smaller, and in fact Coneeny now proposed to make it larger by adding to it the area of Parcel 28-4. Satisfied on these points, therefore, the building inspector issued the foundation and building permits.
For purposes of this discussion I assume, without deciding, the correctness of the building inspector’s determination that replacement of an old, seasonal, camp-style “cottage” with a year-round, fully appointed home qualified as a “reconstruction” of a single . .. family residential structure. "[7] A reconstruction of a single or two-family residence enjoys “special protection” under c. 40A, §6, paragraph 1 and under Section 11 .E of the 2000 bylaw, in that the only inquiiy is whether or not the project “increasefs] the nonconforming nature of said structure.” Rockwood v. Snow Inn Corp., 409 Mass. 361, 364 (1991).
Nevertheless, the building inspector’s approval of the project ran afoul of both Chapter 40A and the Billerica zoning bylaw in several respects. One was the requirement of Section ll.B that a nonconforming building or use that has been discontinued for two years or more — as the “cottage” surely had been— must “thereafter conform.”[8] This section, enacted under the authorily of c. 40A, §6, third paragraph,[9] must mean that a structure that was tom down more than two years ago cannot be “reconstructed” without conforming with current requirements (or at least with the requirements for grandfathered lots, if applicable; but see notes 8 and 10). Were it otherwise, every nonconforming lot containing a cellarhole would be a buildable lot, a result that the two-year abandonment provision was evidently drafted to avoid.
The building inspector was also mistaken in his determination that the “reconstruction” did not result in increased nonconformity. While pulling the footprint of the “reconstructed” structure farther from the roads than where the cottage had been may have ameliorated the nonconformity in front yard setback, it created a new nonconformity in the side yard setback — as it happens, the setback most directly affecting the plaintiff. The Coneeny house is sited 12 feet from the side lot line it shares with the plaintiffs property. That would be enough for certain grandfathered lots, which under Section 7.1.A may be as close as 7.5 feet, but it does not conform with current requirements.
The first paragraph of Chapter 40A, Section 6, on which Section 11 of the Billerica bylaw was based, provides that:
Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent except where alteration, reconstruction, extension or structural change to a single or two-famüy residential structure does not increase the nonconforming nature of said structure . . . (emphasis supplied).
This section has been interpreted to mean that
even as to a single or two-family residence, structures to which the statute appears to give special protection, the zoning ordinance or by-law applies to a reconstruction, extension, or change that “would intensify the existing nonconformities or result in additional ones."
Rockwood v. Snow Inn Corp., 409 Mass. 361, 364 (1991) (emphasis supplied), quoting Willard v. Board of Appeals of Orleans, 25 Mass.App.Ct. 15, 22 (1987).
Thus, by relocating the structure closer than fifteen feet from the side lot line shared with the plaintiff, the project created anew dimensional nonconformity. There was another nonconformity, however, even more glaring: the new house actually straddles the lot line between Parcels 28-2 and 28-4. The owners and the building inspector appear to have treated these lots functionally as one, but in fact they were in separate ownership when Billerica passed its first zoning ordinance, when the building inspector issued the foundation and building permits, when he refused to issue a cease and desist order, and throughout the construction. They remained separately owned, in fact, until five days before trial, when Angela Culot conveyed 28-4 to the Bear Hill Realty Trust, which already owned 28-2.
The bylaw, Section 7.1.A, unequivocally required setbacks “on each lot” of 35 feet in front, 20 in the rear, and 15 on the sides, except that “on each lot in existence when” the front and side setbacks were 20 and 7 feet, respectively, those lesser setback requirements apply. To treat separately owned lots as one and *574 straddle the common bound with a house is to ignore the plain language of the bylaw, and to transgress what would seem to be a basic principle of zoning: that a structure must exist within the boundaries of a lot. “Lot” is defined, in the 2000 bylaw, as
An area of land in one ownership with definite boundaries ascertainable by recorded deed or plan and used or set aside and available for use as the site of one or more buildings or structures or for any other definite use.
Whatever else the combination of Parcels 28-2 and 28-4 may have been, it was not, in the year 2000, “[a]n area of land in one ownership.”
The January 17,2003 conveyance from Culot to Bear HiE appears to have been an attempt to cure these defects, and perhaps also to come within the principle of Vassalotti v. Board of Appeals of Sudbury, 348 Mass. 658 (1965), which (in the Appeals Court’s more recent and concise re-statement) “held that the combination of three contiguous undersized lots that together feE below the then required minimum area had produced one lawful— because grandfathered — undersized lot.” Burke v. Zoning Board of Appeals of Harwich, 38 Mass.App.Ct. 957, 959 (1995). By bringing lots 28-2 and 28-4 — each under 5.000 square feet and thus ineEgible for grandfathering — into common ownership, Bear Hill Really Trust has attempted to create, albeit belatedly, a single lot of 6,360 square feet.
Assuming that the grandfathering provision of c. 40A, §6, paragraph 4 could ever be applied to this formerly improved real estate,[10] it was unavailable here because the combined, 6,360 square foot lot was not in existence, and the two lots were not in common ownership, at the time Billerica passed its first zoning bylaw in 1945. See Appendix. For grandfathering purposes, “the status of ownership of a lot is determined as of the date of the zoning change.” Adamowicz v. Ipswich, 395 Mass. 757, 763 (1985). The 1945 bylaw estabEshed a minimum lot size of 7,500 square feet for a single family residence, which has been increased incrementaEy since then to the current requirement of 30.000 square feet. Parcels 28-2 and 28-4 first came into common ownership in 1978 (under CalEson); they were severed in 1995, and re-joined in 2003. Even if the advantages of the 1978 merger could be considered to have survived the later severance and re-joinder, this still would be, at best,a6,360 square foot lot created in 1978, 33 years too late to enjoy grandfathered status.
Stated another way, a developer cannot acquire adjoining lots, each under 5,000 square feet in area and previously under separate ownership, to make a single, aggregated, “grandfathered” lot; lots thus aggregated must comply with cunrent zoning. This was Judge Hillman’s holding in granting summary judgment to the Board of Appeals in the earlier, consolidated cases. The defendants did not appeal that decision, and suggest no reason to question it now.[11]
Finally, the house also ran afoul of the 2000 bylaw’s restriction on building height, because it was three and one-half stories high. The basement/garage portion of the house is plainly more than one-half above the mean finished grade, and thus qualifies as a “story” under Section 2.48 of the bylaw. Above this are a first story, a second story, and an attic that is not a “story” under Section 2.48 but may qualify as a half-story under Section 2.49. The house thus violated the two and one-half story height limitation of Section 8.1 of the bylaw.
The buEding inspector justified his approval of a three-story buEding by asserting that the bylaw language in Section 8.1 — "shaE not exceed two and one-half (2Vb) stories or thirty-five (35) feet in height" — meant that a structure conformed so long as it met either the Emit on stories or the Emit on absolute height, and need not comply with both. The bylaw’s plain language is to the contrary, however; a close paraphrase would be, “shall exceed neither 2 stories nor 35 feet in height.” Zoning ordinances and bylaws across the Commonwealth have imposed similar limitations using various forms of words, some more and some less clearly than BiEerica’s, but the common intention appears to be that where Emits are expressed in terms of both stories and feet, the structure must comply with both (with allowances, as in Billerica’s Section 8.5, for such architectural features as spires, chimneys, tanks, etc.). See, e.g., the bylaws and ordinances quoted in: Martin v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, 434 Mass. 141, 143 (2001); Tofias v. Butler, 26 Mass.App.Ct. 89, 97 (1988); Pellegrino v. City Council of Springfield, 22 Mass.App.Ct. 459, 460 (1986); Bell v. Board of Appeals of Cohasset, 11 Mass.App.Ct. 97, 110 (1982); Bible Speaks v. Board of Appeals of Lenox, 8 Mass.App.Ct. 19, 21 n.5 (1979).
I am mindful, of course, that even though this enforcement action does not involve such classically discretionary decision making as on an appHcation for a variance or a special permit, the building inspector’s and the Board’s interpretation of the Billerica zoning bylaw are nevertheless entitled to weight. This is a case, however, in which “a blind deference to the building inspector would be tantamount to . . . abdicating the judicial function.” Hebb v. Lamport, 4 Mass.App.Ct. 202, 209 (1976); see also Mahoney v. Chelsea, 20 Mass.App.Ct. 91, 98-99 (1985) (building inspector’s persistent but erroneous interpretation of bylaw “was not entitled to deference”).
2. Legality Under the 2001 Bylaw
The defendants, in addition to maintaining that the permits were appropriately issued under the 2000 bylaw, argue that changes in the 2001 bylaw have further solidified the “as of right” status of the project, making the controversy moot. It certainly is true that the new bylaw changed the requirements applicable to this project in several respects ..each to the builder’s benefit. Specifically:
*575 The new section 10.E. 1 now exempts single and two-family dwellings on lots of5,000 square feet or greater from the rule that structures and uses are automatically deemed abandoned after two years of non-use.
Section 10.C provides that a single or two-family dwelling may be reconstructed as a matter of right, “without increasing the nonconforming nature of such dwelling,” provided either that (1) “(t]he dwelling is located on a lot of 5,000 square feet or greater” (§10.C. l.a), audits setbacks comply with the requirements in effect at the time the original dwelling was constructed but not less than 20 feet (front) and 7lh feet (sides and rear) (§10.C. l.b), or (1) that the reconstruction is within the same footprint of the old structure and does not increase its height and bulk. (§10.C.l.d) The section thus creates a sort of “safe harbor” for one and two-family dwellings: if the dwelling either meets the minimum requirements of subsections a and b for minimum lot area and setbacks, or is reconstructed within the original footprint, then the reconstruction is conclusively presumed not to increase nonconformity.
A reconstruction that does increase nonconformity may nonetheless be permitted if the ZBA finds that the project “is not substantially more detrimental to the neighborhood than the pre-existing, nonconforming dwelling.” (§10.C.3)
The 2001 revisions did not, however, materially change the maximum height for a structure in residential districts: it is still 35 feet or 2Vz stories (section 7.5 and Table J).[12]
The new bylaw, although certainly more welcoming toward residential reconstructions than the old, thus fell well short of transforming this into an as-of-right project. At the veiy least, a height variance would be required. Moreover, the fact that at the time the permits were issued, the structure straddled two lots in separate ownership, was as much a baffler under the new bylaw as under the old. With one immaterial difference,[13] the 2001 bylaw carries forward the definition of “lot” from the 2000 bylaw, quoted above, leading again to the ineluctable conclusion that the combination of the separately owned Parcels 28-2 and 28-4 was not a “lot.” The structure was thus not built on a single lot; it could not meet setback requirements of any sort; and it did not meet the minimum requirements as to lot area and setbacks required for as-of-right treatment under new Section 10.C.
The question remains, however, what is the appropriate relief? The project’s troubled history notwithstanding, I do not believe the matter is yet ripe for an order of demolition. Since the permits were issued, a new bylaw has come into effect, and title to Parcel 28-4 has passed to the owner of 28-2. The Board of Appeals has not considered the project in its current configuration or under the current bylaw. It seems a wasteful exercise of the Court’s equitable powers to order demolition of a completed structure that might be thereupon rebuilt, after compliance with proper procedures, under a new bylaw, and assuming favorable action by the Board of Appeals. If an illegality might, in theory, be rectified with a variance, permit, or other action by the local authorities, the owner ought to be given a reasonable opportunity to apply. Building Inspector of Falmouth v. Haddad, 369 Mass. 452, 459-61 (1976); Chambers v. Building Inspector of Peabody, 40 Mass.App.Ct. 762, 769 (1996). The matter will therefore be remanded to the Board for further action in conformity with this opinion.
In addition to the question of whether the project qualifies for a variance as to height the Board of Appeals will need to consider the thorny question of whether, now that lots 28-2 and 28-4 are again in common ownership, the reconstruction qualifies for Section lO.C’s “safe harbor”: is this a reconstruction of a “dwelling .. . located on a lot of 5,000 square feet or greater”? (Section lO.C.l.a.) This requires consideration of whether the “cottage” qualified as a “dwelling” (see footnote 7); whether it was abandoned as a matter of law even though the strict two-year provision of Section 10.E.1 did not apply (see footnotes 8 and 10); and of whether the recent return of Parcels 28-2 and 28-4 into common ownership permits their aggregation as a 5,000 square foot lot for purposes of the reconstruction “safe harbor,” even though it would not work for purposes of grandfathering under c. 40A, §6, fourth paragraph.[14]
The “basic purpose of the zoning laws ... ‘to foster conforming lots’ ” (Asack v. Board of Appeals of Westwood 47 Mass.App.Ct. 733, 736 (1999) (citation omitted)) may argue for a strict interpretation on any or all of these issues. Because they are matters of bylaw, not statutory, construction, however, it seems best to commit them to the Board of Appeals in the first instance. See Fitzsimonds, 21 Mass.App.Ct. at 56-57. There may be other issues as well that become apparent as the Board of Appeals undertakes to apply the 2001 bylaw to this 2000 project.
ORDER FOR JUDGMENT
For the foregoing reasons, final judgment is to enter, as follows: The October 6, 2000 decision of the Board of Appeals, affirming the building inspector’s refusal to issue the requested cease and desist order, is REVERSED. The owners of Parcels 28-2 and 28-4 may, within thirty days after the entiy of judgment, apply to the Board of Appeals for whatever permits, variances, or other relief may be appropriate with respect to the structure thereon. The Board is to make its determinations without regard to any self-created hardship stemming from the builder’s election to continue construction after he was on notice, by the plaintiffs actions and by the Court’s 9/25/00 Order, that continued construction was at his financial peril. The Court will retain jurisdiction to reopen the case in the event further proceedings are appropriate.
*576 APPENDIX B: SUMMARY OF TITLE
Date Lot 28-2 - Date Rook/Page (375 ft 375A1 Book/Page Lot 28-4 (374 ft 374A]
12/5/13 Suburban Land Co, to
516/272 Co. to Maude Bertha
La Morder
[gap in title] 7/19/40 John D. Cooke to
561/948 F. Raymond Surber
12/21/70 Charlotte Surber to
1945/261 William B. & Evelyn Callison
11 /27/78 Hope Allin Fritsch to
2340/715 William B. Callison
1/27/95 William B. Callison to
7372/37 Angela M. Culot
9/10/98 Estate of William B.
9733/82 Callison to Edward P. Coneeny
1/17/03 Angela M. Culot to
Coneeny and Bavis,
as Trustees of Bear
Hill Realty Trust
Sources: Trial Ex. I (tabs 25 &25), 7, 19.

Editor’s note: The referenced appendices A and C are not included with this reported opinion.

The familial relationship, and the nominal consideration recited in this deed ($100, as compared to those in the two deeds to Coneeny ($40,000 and $39,900, respectively) suggest that Ms. Culot may have acted as her father’s nominee. Neither side offered evidence on this point, however, or on the ownership of the beneficial interest in the Bear Hill Really Trust. 1 therefore take the ownership of the various lots at face value, as shown on the deeds.

These have included Angela Culot, Edward Coneeny, the Bear Hill Realty Trust, William B. Callison, and Callison’s estate, acting variously as owners and contracted purchasers and sellers of 28-2 and/or 28-4. Precisely who did what in the permitting process, and in which capacity, is not material to this part of the discussion, and so for simplicity’s sake, they are treated together as “owners.” ■

The understanding evidently followed a meeting between town counsel and the ZBA on March 2, 2000. The plaintiff testified that she was unaware of the agreement, but has alleged no violation of the open meeting law.

The plaintiffs expert Lanata testified that he took elevations of three of the four comers of the house to compute the mean elevation. He did this from the plaintiffs property, without entering the subject property, and so was unable to shoot the fourth comer, whose elevation is needed for a precise computation of the mean elevation. The photos in evidence show an approximately level lot. I am satisfied, and find, that the 7.3 foot estimate is substantially accurate — accurate enough, at any rate, for a determination whether or not the basement-garage story extends more than halfway above grade.

In this determination, he considered the Assessors’ denomination of the structure as a dwelling for tax purposes, and also the presence or absence of potable water, sanitation, and other such amenities.

See Fitzsimonds v. Board of Appeals of Chatham, 21 Mass.App.Ct. 53, 56-57 (1985) (noting that whether or not a seasonal cottage constitutes a “dwelling” for these purposes should not be treated "as if it presented a nice legal point upon a motion to dismiss,” but is best committed, “at least in the first instance,” to the Board of Appeals, which “brings to the matter an intimate understanding of the immediate circumstances, of local conditions, and of the background and purposes of the entire by-law”).

This provision explicitly applied to “nonconforming building[s]” as well as ”use[s].” It differed in this respect from the bylaw considered in Dial Away, Inc. v. Board of Appeals of Auburn, 41 Mass.App.Ct. 165, 166 n.3, 171 (1996), whose abandonment provision applied only to nonconforming “uses.” The Appeals Court, noting that “our cases seem to distinguish between nonconforming uses and structures,” there held that the abandonment provision of the Auburn bylaw did not apply to a demolished structure, but nonetheless held that avoluntaiy demolition coupled with the passage of 23 years constituted abandonment as amatter of law, a conclusion that would follow on the facts of this case as well.

“A zoning ordinance or by-law may define and regulate nonconforming uses and structures abandoned or not used for a period of two years or more.”

The Dial Away case, note 8, supra, appears to hold that the first and fourth paragraphs of section 6 are mutually exclusive, and that a parcel which has once been improved with a residence cannot be treated as vacant and thus within paragraph 4, even if the right to reconstruct under paragraph 1 has been lost by abandonment. 41 Mass.App.Ct. at 167-68. Because grandfathering is inapplicable to the present case for other reasons, it is unnecessary to test the logic of this reading of Dial Away.

There is another merger issue to be addressed, having to do with the plaintiffs own properly. Mr. and Mrs. Callison acquired parcel 28-4 and the plaintiffs lot (parcel 28-5) in 1970, in the same deed from the same grantor, who (perhaps with her husband) had evidently held them both for some undetermined period of time before then. These lots remained in common ownership until January 27, 1995, when Mr. Callison conveyed 28-4 to Culot and 28-5 to Coneeny. The plaintiff, citing Asack v. Board of Appeals of Westwood, 47 Mass.App.Ct. 733, 735-36 (1999), argue that the case thus falls within “the zoning principle that precludes an owner from availing [herself] of a nonconforming exemption unless [she includes [her] adjacent land in order to minimize the nonconformity,” and its corollary that “adjacent lots in common ownership will normally be treated as a single lot for zoning purposes so as to minimize nonconformities.” Preston v. Board of Appeals of Hull, 51 Mass.App.Ct. 236, 238 (2001) (citations omitted).
The legal point is correct but the plaintiff is in a poor position to assert it: the improper re-severance of the parcels took place in 1995, and is the reason that the plaintiff herself occupies a house constructed on a nonconforming, purportedly grandfathered lot. Equitable principles preclude her from asserting against the Coneenys a legal principle whose violation has benefitted her. See Hogan v. Hayes, 19 Mass.App.Ct. 399, 404 (1985).

In fact, the definition of a “story” appears to have changed to the owners’ detriment, in that the 2001 version does not exempt basements that are more than half belowthe finished grade. See section 2, definitions of “Height — Story” and of “Story.” Because the basement level in this structure was halfway above grade, and thus already counted as a story under the 2000 bylaw, the 2001 change makes no difference in this case.

In 2001, the final word of the definition was changed from “use” to “purpose.”

If the project is not within section lO.C’s safe harbor, then it is plainly more nonconforming than the “cottage,” and the Board will need to consider whether or not it is substantially more detrimental to the neighborhood. Section 10.C.3.