MATTHEW BARVENIK & others vs. BOARD OF ALDERMEN OF NEWTON & another.[1]

No. 90-P-503.

Suffolk. December 19, 1991. - August 3, 1992.

Present: ARMSTRONG, PERRETTA, & LAURENCE, JJ.

*Zoning*, Appeal, Special permit, Person aggrieved. *Practice, Civil*, Zoning appeal, Standing, Parties.

Discussion of cases setting forth the standards for determining a party's standing as an aggrieved person under G. L. c. 40A, § 17, to challenge a zoning board's action. [130-133]

Plaintiffs in an action brought under G. L. c. 40A, § 17, to challenge a zoning board's grant of a special permit, did not meet their burden of proving they were parties "aggrieved," where they did not present evidence that demonstrated a reasonable likelihood of tangible, as opposed to speculative, harm to their property or to any other recognized legal rights or interests as a proximate result of the construction project authorized by the special permit. [134-139]

CIVIL ACTION commenced in the Land Court Department on December 18, 1987.

The case was heard by *Marilyn M. Sullivan*, J.

The case was submitted on briefs.

*Robert Cohen & John M. Babington* for the plaintiffs.

*Daniel M. Funk*, City Solicitor & *Michael D. Baseman*, Assistant City Solicitor, for Board of Aldermen of Newton.

*David S. Weiss & Eric L. Yaffe* for The Green Company, Inc.

LAURENCE, J. Various Newton property owners living near the site of the former St. Sebastian's School, now owned by The Green Company, Inc. (Green), filed a complaint in the Land Court, pursuant to G. L. c. 40A, § 17, seeking to annul a special permit granted to Green by the board of aldermen

---

[1]The Green Company, Inc.

of the city of Newton. All of the plaintiffs reside in a Single Residence 2 district in Newton adjacent to the locus at issue in this case; the locus is in a Multi-Residence 3 (two-family residence) district.[2]

The special permit authorized Green to construct 114 housing units on the Newton portion of the site, primarily for persons fifty-five years of age or older.[3] Following a seven-day trial, a Land Court judge rejected all of the substantive arguments advanced by the plaintiffs against the validity of the board's action and affirmed the board's order. Although we are satisfied that the judge properly affirmed the board's grant of the special permit to Green on the grounds stated, we need not reach the merits of the appeal, because the plaintiffs failed to show they were aggrieved persons with standing to maintain the action under G. L. c. 40A, § 17.[4]

A small but reasonably coherent body of case law has developed explicating the standards for determining aggrievement under G. L. c. 40A, § 17.[5] The most significant of the decisions are *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, 324 Mass. 427, 433 (1949); *Marotta* v. *Board of Appeals of Revere*, 336 Mass. 199, 202-204 (1957); *Waltham Motor Inn, Inc.* v. *LaCava*, 3 Mass. App. Ct. 210, 213-217 (1975); *Rafferty* v. *Sancta Maria Hosp.*, 5

[2]The plaintiffs described themselves as the "Neighborhood Association," but there is nothing in the record that indicates the existence of any such entity or that the plaintiffs constitute it.

[3]The former St. Sebastian's school occupied a sixteen-acre parcel of land straddling the Newton and Boston (Brighton) lines, ten acres of which are in Newton.

[4]The judge correctly held that all of the plaintiffs except the five who were abutters or abutters to abutters (two of whom were husband and wife living in the same home) had no standing because they had shown "no effect of the grant [of the special permit] on them different from that of the general populace of Newton." That holding was not challenged on appeal. The judge rejected the defendants' posttrial but predecision challenge to the abutter plaintiffs' standing, stating that in her opinion those plaintiffs had testified to sufficient impact of the proposed project on them to confer standing.

[5]Some of the cases involved the predecessor statute to G. L. c. 40A, § 17, G. L. c. 40A, § 21 (as in effect prior to St. 1975, c. 808, § 3), which was essentially similar in conferring a right to judicial review of a municipal zoning decision only on a "person aggrieved by" such decision.

Mass. App. Ct. 624, 626, 629-630 (1977); *Paulding* v. *Bruins*, 18 Mass. App. Ct. 707, 709 (1984); *Sherrill House, Inc.* v. *Board of Appeal of Boston*, 19 Mass. App. Ct. 274 (1985); *Bedford* v. *Trustees of Boston Univ.*, 25 Mass. App. Ct. 372, 376-378 (1988); and *Harvard Square Defense Fund, Inc.* v. *Planning Bd. of Cambridge*, 27 Mass. App. Ct. 491, 492-495 (1989).

From these decisions we derive a number of controlling principles and guidelines for § 17 standing. "Aggrieved person" status is a jurisdictional prerequisite. Unless brought by a municipal officer or board, a court has jurisdiction to consider a zoning appeal only if it is taken by an aggrieved person.[6] Although abutters and abutters to abutters enjoy a presumption of aggrieved person status, the presumption is rebuttable. Once a defendant in a § 17 appeal challenges the plaintiff's standing and offers evidence to support the challenge — as the defendants did here — the jurisdictional issue is to be decided on the basis of the evidence with no benefit to the plaintiff from the presumption.[7] The plaintiff then

---

[6]The issue of standing was timely raised by the defendants, who proffered evidence challenging the plaintiffs' standing both before trial (on the basis of the plaintiffs' discovery responses) and after trial (on the basis of the trial testimony) and extensively briefed the issue on appeal. The plaintiffs' brief on appeal did not discuss the subject of standing. Lack of standing may be raised at any point in a litigation, including after adjudication on the merits and during appeal, if the record shows lack of standing as matter of law. See, e.g., *Marotta* v. *Board of Appeals of Revere*, 336 Mass. at 203; *Litton Bus. Sys., Inc.* v. *Commissioner of Revenue*, 383 Mass. 619, 622 (1981); *Bonan* v. *Boston*, 398 Mass. 315, 320-322 (1986).

[7]*Marotta* v. *Board of Appeals of Revere*, 336 Mass. at 204, spoke of the presumption of aggrievement being destroyed upon the defendant's contesting of the point and introducing "any additional evidence." Subsequent standing decisions in zoning cases have not explicitly addressed the issue of the amount or nature of the defendant's evidence required in this regard, but have merely noted that the presumption disappeared when "additional evidence was offered," *Waltham Motor Inn, Inc.* v. *LaCava*, 3 Mass. App. Ct. at 217, or when "the plaintiffs' status as aggrieved persons was challenged," *Redstone* v. *Board of Appeals of Chelmsford*, 11 Mass. App. Ct. 383, 385 (1981). By citing to *Krantz* v. *John Hancock Mut. Life Ins. Co.*, 335 Mass. 703, 711-713 (1957), the court in *Marotta*, 336 Mass. at 204, may have been indicating that not merely any evidence negating aggrievement is adequate, but rather evidence which "if duly proved would permit a jury to find" the nonexistence of the presumed fact. *Krantz*, 335

has the burden of proof on the issue of standing.[8] Satisfaction of that burden requires proof that the plaintiff is one of the limited class of individuals who are entitled to challenge a zoning board's exercise of discretion.

To qualify for that limited class, a plaintiff must establish — by direct facts and not by speculative personal opinion — that his injury is special and different from the concerns of the rest of the community. He must show that his legal rights have been, or likely will be, infringed or his property interests adversely affected.[9] Subjective and unspecific fears

Mass. at 711. See Liacos, Massachusetts Evidence 53-54 (5th ed. 1981) ("A presumption is rebutted by evidence warranting a finding contrary to the presumed fact"). However the standard may be precisely formulated, the defendants' considerable trial evidence establishing that the permitted project would not cause or aggravate the problems foreseen by the plaintiffs was in our view sufficient to rebut the presumption of standing here.

[8]No case has clearly articulated the measure of the plaintiffs' burden in proving the requisite aggrievement, after the pleading stage, in order to establish standing for § 17 purposes once the abutter's presumption is no longer operative. We need not decide, however, whether satisfaction of the plaintiffs' burden of proof as to the facts of their alleged aggrievement here required a preponderance of the evidence as in civil cases generally, see Hughes, Evidence § 24 (1961), or some other quantum. Under any applicable standard, the plaintiffs did not meet their burden here, since the evidence they presented at trial was characterized by speculative opinion and surmise and did not controvert the defendants' extensive showing that the plaintiffs would suffer no tangible, proximately caused injury to any of their legal rights or interests from the proposed project under the special permit (see discussion *infra*).

[9]The Federal law of standing is decidedly more expansive than that of Massachusetts, in that aggrievement has been found in harm to many kinds of noneconomic interests that does not constitute injury to a private legal right or property interest. See, e.g., *Association of Data Processing Servs. Orgs., Inc.* v. *Camp*, 397 U.S. 150, 151-154 (1970) (question whether action causes plaintiff "injury in fact, economic or otherwise"); *Sierra Club* v. *Morton*, 405 U.S. 727, 734, 740-741 (1972); *United States* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 683-690 (1973). Yet, even under the more liberal Federal standard a plaintiff challenging agency action ". . . must have suffered an 'injury in fact' — an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical,"' . . . . Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly trace[able] to the challenged action . . . . [These] are not mere pleading requirements but rather an indispensable part of the plaintiff's case[;] each element [of standing] must be supported in the same way as

about the possible impairment of aesthetics or neighborhood appearance, incompatible architectural styles, the diminishment of close neighborhood feeling, or the loss of open or natural space are all considered insufficient bases for aggrievement under Massachusetts law.

Even when positing legitimate zoning-related concerns, including possible vehicular traffic increases, anticipated parking problems, and the potential for litter, a plaintiff must nonetheless offer more than conjecture and hypothesis. He must provide specific evidence demonstrating a reasonable likelihood that the granting of a special permit will result, if not in a diminution in the value of his property, at least in his property or legal rights being more adversely affected by the activity authorized by the permit than (a) they are by present uses and activities or (b) they would be as a result of the uses and activities permitted as of right on the defendant's locus. Otherwise, a would-be plaintiff lacks the requisite standing and cannot maintain an appeal under G. L. c. 40A, § 17, even if his property abuts or is very near the property subject to the permit.[10]

---

any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. . . . At the pleading stage [on a motion to dismiss], general factual allegations of injury resulting from the defendant's conduct may suffice . . . . In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' . . . . And at the final stage, those facts [if controverted] must be 'supported adequately by the evidence adduced at trial.' " *Lujan* v. *Defenders of Wildlife*, 112 S.Ct. 2130, 2136-2137 (1992).

We are satisfied, for the reasons discussed below, that the plaintiffs here would have failed to satisfy even these substantially more relaxed Federal standing requirements.

[10]The policy reasons for the standing doctrine enunciated by the Supreme Judicial Court in 1975, in the course of emphasizing that the law of standing is not a mere technicality but a vital element of all proceedings challenging administrative action, remain persuasive:

"We point out that the question whether a party has standing to participate in a judicial proceeding is not simply a procedural technicality but rather involves remedial rights affecting the whole of the proceeding. Additionally, whether a party is properly before a tribunal to invoke its judicial powers affects the good order and efficiency

The plaintiffs here — having lost their presumptive stand-ing following the defendants' evidentiary challenge — fell far short of making an adequate showing that they were ag-grieved in the sense required by the controlling authorities. Their complaint merely asserted that they either were abut-ters or abutters to abutters or were otherwise "aggrieved per-sons within the meaning of" G. L. c. 40A, § 17; it recited no facts reflecting legal aggrievement. Their objections to the board's action were not grounded in concern for any actual or potential decrease in the value of their properties caused by the elderly housing project to be built under the special permit — indeed, none of the plaintiffs even mentioned this factor in their testimony. Contrast *Tsagronis* v. *Board of Ap-peals of Wareham, ante* 55, 58-59 (1992). Instead, as the judge noted, the plaintiffs' opposition had roots "in more per-sonal reasons."[11]

---

with which the matter proceeds. . . . The multiplicity of parties and the increased participation by persons whose rights are at best ob-scure will, in the absence of *exact adherence to requirements as to standing,* seriously erode the efficacy of the administrative process. We do not say that increased citizen participation is bad. On the contrary, such interest ensures full review of all issues. However, to preserve orderly administrative processes and judicial review thereof, *a party must meet the legal requirements necessary to confer stand-ing.*" (Emphases added.) *Save the Bay, Inc.* v. *Department of Pub. Utils.,* 366 Mass. 667, 672 (1975).

[11]The testimony of the five would-be presumptively aggrieved plaintiffs reveals the personal and subjective origins of their opposition to the pro-ject. Donald Lubin was primarily concerned not so much about the traffic and noise that he anticipated (without any factual basis) would be exacer-bated by the proposed project but rather by the traffic and noise that would "flow from any development, period, that would be up in that area." Susan Jane Conant vehemently stated that "I just don't like the way the [proposed] buildings look" and "I think that a big development of any kind simply doesn't belong on this property. I think it's not the right place for it. It isn't the way things have been. It isn't the way I want them to be." Judith Topping lamented that development of the site "will change what we have a great deal," and feared that residents of the proposed complex near her "may sit out there [on their deck] and they may do a lot of things that I may find objectionable." She did not identify what sort of objectionable conduct she apprehended. Trexler Topping, her husband, was simply "very concerned about this whole system" and how "out of keeping" the proposal was with the neighborhood, which had grown accus-

The judge properly dismissed the plaintiffs' "personal dislike of the architecture, distress at [assumed] interference with their view or unhappiness at changes in the existing vegetation on the [Green] site" as angst insufficient to "rise to the level of a valid reason for the court to weigh in considering the validity of the board's action." Such matters are ineffective to sustain standing. See *Harvard Square Defense Fund, Inc.* v. *Planning Bd. of Cambridge*, 27 Mass. App. Ct. at 493. See also *Baxter* v. *Board of Appeals of Barnstable*, 29 Mass. App. Ct. 993, 995 (1990).

The judge found, however, that certain of the concerns of the five abutters and abutters to abutters were "legitimate" and "affected them more particularly than other residents of Newton." These concerns arose out of their personal belief that the Green project would cause more traffic, which they felt was already heavy, than Green's expert witnesses had calculated; that the area's habitually low water pressure, which had been inadequate during a fire several years before at the former school, might be lowered by the needs of the project; and, with respect to one abutter, that the drainage from the site, which had always caused him water problems and resulted in pooling in his backyard all year round, might

tomed to using the site "as a place to walk around, to stroll about, to enjoy the environment." He expressed special distaste for a planned tennis court supposedly within earshot which would, he assumed, disturb him "with tennis balls . . . bouncing from morning to evening." Daniel Dacey, whose house faced a golf course on one side, opined that the elderly housing proposal was "totally inconsistent" with the character of his neighborhood of "large, single-family parcels of land, graceful estates" and "will detract from the appearance of the area," particularly since he assumed he would see and hear increased traffic from the non-golf course side of his "triplex, which has . . . three floors of glass that . . . look onto the proposed street." However sincere may have been these understandable concerns about their changing neighborhood expressed by the existing property owners in the vicinity, they represented merely "matters of general public concern which were appropriately addressed by the extensive administrative proceedings held in this case. These matters, essentially involving the expression of aesthetic views and speculative opinions, do not establish a plausible claim of a definite violation of a private right, property interest, or legal interest sufficient to bring any of the plaintiffs within the zone of standing." *Harvard Square Defense Fund, Inc.* v. *Planning Bd. of Cambridge*, 27 Mass. Ct. at 493.

be exacerbated. The judge concluded that such impacts entitled those five plaintiffs to maintain the action, but she did not discretely analyze the expressed concerns about the project, identify any evidence demonstrating their likelihood, make specific findings as to their sufficiency as impacts supportive of standing, or discuss the controlling case authorities under § 17. Indeed, her actual findings regarding the anticipated impacts of the project undercut the conclusion that the plaintiffs had standing.

With respect to the most persistently reiterated concern, traffic, the judge found that traffic increases from the project would be minimal. The plaintiffs' testimony regarding traffic (as well as in regard to water pressure and drainage) was based solely on their conjecture and suspicions. In direct contradiction to the plaintiffs' uncorroborated speculations, the judge stressed that the defendants' expert (and uncontroverted) testimony on the subject of traffic showed "that the traffic generated by the proposed development would be less than [from] other possible uses due in part to the age of the future occupants."[12] Under these circumstances, the plaintiffs' assertions regarding potential traffic problems were like those advanced and held inadequate in *Harvard Square Defense Fund, Inc.* v. *Planning Board of Cambridge*, 27 Mass. App. Ct. at 493-495. Here, as there, the plaintiffs failed to provide "direct facts to show that users of the buildings constructed under the special permits will generate traffic, or use parking spaces, in excess of what occupants and visitors of a building constructed under a permitted use, not subject to special conditions, would generate. Put another way, the plaintiffs . . . show only that any 'increase in traffic [and parking] is problematical and might be little, if any, greater than that from [a use] which could lawfully be erected on

---

[12]The defendants' experts extensively testified, without contradiction, that, because the Green proposal called for the construction of housing for the elderly, including 107 units of congregate housing, the anticipated traffic would be far less (fifty-four percent) than it was when the site was a school and significantly less (thirty-eight percent) than it would be if Green were to develop the parcels for single or two-family housing, which it could do as a matter of right.

the . . . land [without the need for a special permit].' *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, 324 Mass. 427, 430 (1949)." *Id.* at 494-495.

The other ostensible concerns thought adequate for standing purposes by the judge — water pressure and drainage — suffered from the same flaws as the traffic issue and do not withstand the *Harvard Square Defense Fund* analysis. The plaintiffs' anxieties concerning the adequacy of water pressure if the Green project were constructed were, "because of the special conditions annexed to the permit[ ]," . . . "at best speculative." 27 Mass. App. Ct. at 494. The board's special permit was made subject to numerous conditions, quoted by the judge in their entirety, which, among other things, expressly prohibited Green from proceeding with any construction unless and until the Newton water department had approved the adequacy of water pressure to the site (which lies upland of all of the plaintiffs) and the city engineer had approved the plans for all utilities. The judge explicitly found (presumably on the basis of the evidence introduced on the issue by the defendants' experts) that the area's water problems were typical of those elsewhere in the city and that the new construction should in fact improve both water quality and water pressure. The plaintiffs submitted no evidence to show that Green's proposed development would have adverse impact on their water pressure and distribution in the future any differently from the present situation or that which would result from any Green development as of right on the locus (which could accommodate sixty-eight dwelling units in two-family residences without special permit).

The one plaintiff who feared increased water drainage onto his property — a fear which would, if substantiated, have constituted cognizable injury on which to base standing — similarly produced no evidence justifying his concern, in light of the evidence presented by the defendants.[13] The uncon-

---

[13]This plaintiff, Daniel Dacey, who was not qualified as an expert on any subject, first assumed, with no basis in the record, that the vegetation on the portion of the site facing his property would be ripped up or cut down by Green in connection with the proposed development; then further sup-

tested expert testimony demonstrated that planned detention and catch basins would control and prevent any water that might run off from the site and that less water than at present would run off on the plaintiff's side of the slope once the project was built. The judge's findings appear to have credited the expert testimony concerning the drainage issue. Moreover, the board's order mandated that no building could begin on the site until the city engineer and an independent engineer had approved the adequacy of Green's plans for storm drainage.[14]

In short, none of the plaintiffs presented evidence that demonstrated a reasonable likelihood of any tangible, as opposed to speculative, harm to their property or to any other recognized legal rights or interests as a proximate result of the construction project authorized by the special permit they challenged. Contrast *Bedford v. Trustees of Boston Univ.*, 25 Mass. App. Ct. at 377-378. This case falls squarely within the principles of *Circle Lounge & Grille, Inc.*, 324 Mass. at 430-431, and its progeny. The plaintiffs'

---

posed, again with no evidentiary support, that the development would increase the amount of drainage and runoff on the slope facing him; then finally presumed that whatever additional runoff was created by the development would enlarge the present and persistent water accumulation on his property. As a cautionary observation, we do not intend to suggest that plaintiffs asserting zoning aggrievement can never succeed, once their standing is contested, without producing expert witnesses on their behalf. The need for expert testimony depends, as in all cases, upon the trial judge's discretionary determination whether or not the subject matter is beyond the scope of the common knowledge, experience and understanding of the trier of fact without expert assistance. See *Commonwealth v. Francis*, 390 Mass. 89, 98 (1983); *Reed v. Canada Dry Corp.*, 5 Mass. App. Ct. 164, 165 (1977). Here, the judge acknowledged the value of expert testimony with respect to the issues of traffic and water distribution and expressly noted that the issues of water pressure, site drainage, storm drainage, and landscaping were "technical questions" and "specialized matters."

[14]The speculative character of the testimony of the plaintiff who feared drainage problems was underlined when, upon being presented with the evidence as to the required catch basins and detention ponds on cross-examination, he simply responded, "I have some concern that one, that that would have adequate capacity to solve the problem, and two, what sanitary problems that may create." He offered no evidence or elaboration to justify those concerns.

naked claims of grievance were not merely "not . . . particularly impressive," *id.* at 430; but, more crucially, were not shown — even were they to come to pass — to be causally attributable to the permitted development. See 3 Ziegler, Rathkopf's The Law of Zoning and Planning § 43.04, at 43-27—43-28 (1991) ("In measuring the claim of injury, it is important to remember that the question of aggrievement relates to what has resulted or will result from a zoning action"). The plaintiffs failed to demonstrate that the deleterious effects they anticipated from the project under the special permit would not ensue as the natural consequences of either existing conditions or as of right development in the zoning district in which the site was located. See *Harvard Square Defense Fund, Inc.* v. *Planning Bd. of Cambridge*, 27 Mass. App. Ct. at 494-495. Cf. *American Can Co.* v. *Milk Control Bd.*, 313 Mass. 156, 160 (1943) (aggrievement is shown by proof that the plaintiff "has suffered an ascertainable property loss as a proximate consequence of the board's action").

"Finally, none of the plaintiffs . . . owns or occupies property in the same zoning district [as the Green site] and, therefore, none of the plaintiffs can demonstrate a 'legitimate interest in preserving the integrity of the district' in which the buildings will be permitted uses." *Harvard Square Defense Fund, Inc.* v. *Planning Bd. of Cambridge*, 27 Mass. App. Ct. at 495.[15]

*Judgment affirmed.*

---

[15]A few decisions have intimated in dicta that owners of property outside the district in which the permitted activity is to take place might have standing in certain circumstances, see *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, 324 Mass. at 432; *Waltham Motor Inn, Inc.* v. *LaCava*, 3 Mass. App. Ct. at 214-215; but no cases have yet recognized standing in such plaintiffs. The plaintiffs' properties here, all in a single-family residence district, were never argued, let alone shown, to be in a "substantially similar" district, see *id.* at 214, to that of the project site, which lies in a Multi-Residence 3 district that by definition is not a single-family neighborhood and is governed by significantly different regulations as to density, minimum lot areas, lot width, and side set-backs.