Fahey, Elizabeth M., J.
INTRODUCTION
The plaintiffs, Joyce Biele (“Biele”) and Marion Lipini Gustowski (“Gustowski”) (collectively, “the plaintiffs”), brought suit seeking to annul the decision of the City of Boston, acting through its Zoning Board of Appeals (“ZBA’j, granting Peter Zagorianakos (“Zagorianakos”), N&P Associates, and the 902 East Second Street, LLC, a variance to develop the property located at 902 East Second Street, South Boston, Massachusetts. The matter was tried jury-waived before this Court on October 23, 2009. For reasons that will be explained, judgment will enter for the plaintiffs.
FINDINGS OF FACT
The parcel at issue, 902 East Second Street (the “Property”), consists of approximately 26,400 square feet of vacant land. It is abutted by East Second Street on the south side and by P Street on the west side. The project site has three hundred (300) feet of frontage on East Second Street and eighty-eight (88) feet of frontage on P Street. Adjacent to the project site north on P Street and east on East Second Street is a former oil transfer facility/distribution depot owned by Coastal Oil Company and Elpaso Oil, which is currently not in use. The Property is in a dense urban neighborhood with mostly residential buildings of two and three stories interspersed with a rare one- or two-stoiy industrial building on East First and East Second Streets. Most of these structures have wood clapboard exteriors and several have brick exteriors.
The Property is located in the South Boston Neighborhood District of the City of Boston. According to the Boston Zoning Map 4 — South Boston District — the Property is located within an Industrial (M-2) Sub-district. In accordance with Boston Zoning Code, Article 13.4, “any dwelling in an L, B, M, I, MER or W district shall conform to the lot area width, usable open space and yard requirements for the nearest S, R or H district.” The nearest residential sub-district is an H-l-50. The Property is also located within the Enhancement Zone Sub-district of the South Boston Waterfront Interim Planning Overlay District (“IPOD”). Boston Zoning Code, Article 27P.
The plaintiffs claim that this project will be a detriment to the public good due to overpopulation, decreased parking, increased traffic and especially serious environmental contamination concerns. The plaintiffs also claim that defendants’ project will cause a strain on the sewage system which is ancient in that area of South Boston.
Gustowski, currently retired, has lived at 24 P Street in South Boston since 1995. She lives in the basement of a three-decker home. Most of the buildings in her immediate neighborhood are two- or three-family homes. There is an apartment building on *349 Broadway, some distance away; the other tallest building in the area is at 925 East Second Street which has approximately twenty (20) units. She was initially concerned because the size of this development was originally going to be a forty-five (45) unit building. Later, she became concerned about parking and traffic, and especially about serious environmental issues. Her unit, being in the basement, is mostly below grade and she is concerned about light, as there are only small windows in her unit.
Biele has lived in a two-family home at 913-15 East Second Street for approximately 15-16 years; her father lives in the second unit. The defendants’ project will be directly in front of and across the street from her home. The lot at issue has been empty since she has lived at that address. It is not disputed that the defendants’ lot was previously used as an oil storage facility and then as an MBTA lot for idling buses and as MBTA vehicle storage, all heavy industrial uses. She is especially concerned about the environmental impact of this development, as she knows that the owner of a nearby building, at 9 P Street and the corner of First Street, let the bank foreclose and take back the building because of what environmental testing revealed to be contamination. The lot next to that property was paved to cover up the grounds after tests indicated a lot of contamination. The Property at issue is approximately half a block away diagonally from Biele’s house. Biele’s concerns are that the project is very big, veiy tall, veiy long and does not fit into the neighborhood. She is especially concerned about the potential for environmental contamination.
The concerns voiced by Biele and Gustowski echo those concerns of neighbors who attended the five to six community meetings about the defendants’ proposed development at 902 East Second Street. They have concerns about the size of the building, the number of units, the exacerbation of already insufficient parking in the area, and especially over environmental issues. According to a May 6, 2008 letter from Senator Jack Hart to the ZBA, “(t)here is still much concern among community residents and the Massachusetts Department of Environmental Protection (DEP) concerning the [Property... relative to contamination.” Ex. 8E. Moreover, Senator Hart stated “(t]he DEP has since requested that sufficient testing and a plan to remediate be completed before the site would be cleared for residential use. The concern over contamination of this site has been voiced by abutters and community residents for some time with no legitimate plan or commitment of testing and remediation submitted by the owner.” Id.
During the final ZBA hearing on May 6,2008, either Zagorianakos or his lawyer on his behalf, who also attended the hearing, agreed to complete an “environmental proviso”[3] within sixty (60) days, prior to any construction or evacuation at the site. Ex. 9, Mem. from Senator Jack Hart to South Boston Constituents.[4] While Zagorianakos claims that some soil samples were later taken and analyzed, no information was offered that the analysis was done by “a Massachusetts certified laboratory” independent of Zagorianakos’ company, Wadleigh Environmental (“Wadleigh”). While the proviso required that Zagorianakos provide the soil testing results to the South Boston Communiiy Health Center and the South Boston Public Library, and it is disputed factually whether it was ever provided to the library, there is no dispute that he never had a ZBA meeting with the community to reveal what the soil test results showed. There was no evidence that a public meeting was held by Zagorianakos to discuss and present the data. Accordingly, at least that section of the proviso, which he voluntarily agreed to do, was never completed.
The defendants’ development project (“Proposed Project”) at the Property is a three-story building of thirty-one (31)[5] units with fifty-two (52) parking spaces,[6] fifty (50) of which are on a single level of underground parking. The footprint of the building will be 264 feet by 68 feet, on a 300 foot by 88 foot parcel. There will be an elevator, addressable fire alarm systems and full sprinkler systems, limited green space, private balconies or decks out back, private roof decks, bike racks and inside trash collection space. Seven entrances will be created along East Second Street to accommodate the residential units. When the number of units was decreased from forty-five (45) to thirty-one (31), the building’s square footage was only reduced from 50,000 to 46,000 square feet. Each of the thirty-one (31) units was designed to be larger and more luxurious. The defendants’ architect, Michael Oratovsky (“Oratovsky”) has a twenty-five percent (25%) financial interest in the Proposed Project. He designed the building with less than 50.000 square feet so that only “small project review” will be done by the Boston Redevelopment Authority (“BRA”).
The rear yard set-back requirement is twenty (20) feet; the Proposed Project has only a fourteen (14) feet rear yard setback. Imposing the twenty (20) feet rear setback would reduce the number of parking spaces by half; taking 6 feet from the building (to satisfy the rear yard set-back) would make the building narrower and, so long as the underground garage is only one level, will eliminate half of the parking spaces, in the basement garage.
Oratovsky testified that the open space required is 14,800 square feet and that the open space provided is 15,516 square feet, including all of the private balconies, decks and roof decks.[7] He claimed that the roof decks, balconies and decks total approximately 5.000 square feet. Given these numbers and his claim that more open space is being provided than is required, he was unable to explain why a variance as to open space was necessary. As far as the roof decks go, *350 deck railings will be ten (10) feet in from the P Street side, as there are residents there, and only six (6) feet in from the E side which face garages.
According to Oratovsky, the Proposed Project meets the conditions required for conditional use approval. See Boston Zoning Code, Article 6 at §6.3.[8] In his opinion, the Proposed Project, as he designed it, does not have any hazards. He does not believe that, if people behave appropriately, any roof deck would be a nuisance. The capacity of the roof deck is one person per forty (40) square feet, and one hundred (100) pounds per square foot for persons, grills, furniture. Oratovsky did not determine if Boston Zoning Code, Article 6 at §6.3A, which governs additional conditions required by the ZBA for approval of parking facilities in a restricted parking district, applied to the Proposed Project.[9]
The Property at 902 East Second Street is a shallow lot, which is typical of at least the immediate neighborhood, if not most of South Boston. This is based on my observations while driving around the Property, the plaintiffs’ homes and their neighborhoods[10] as well as the testimony of the two plaintiffs concerning their property, that their homes take up much of their lot, as well as Oratovsky’s testimony, who had also driven around the neighborhood and observed that other lots in the neighborhood are also narrow/shallow. The Proposed Project will take up the vast majority of the Property.
This “proposed project is located within one block of the Conley Container Terminal, the truck route serving Conley Terminal (East First Street) and the former Coastal Oil Terminal which is expected to be acquired by Massport and used for container-related operations in the future. Conley Terminal is the largest container terminal in New England, and it generates over 26,000 jobs and an estimated $543 million annual economic benefit for the City of Boston and the New England Region. Approximately 120,000 containers will pass through Conley Terminal in 2007, and [Massport] expect[s] to see increased throughput each year going forward.” See Ex. 8B, Massport’s Letter to ZBA dated October 5,2007. As a result of the Proposed Project’s location, Massport advised the ZBA that it preferred “not to see new residential development occur so close to the container terminal.” Id.
The defendants’ Property requires Variances and a Conditional Use Permit under the terms of the Boston Zoning Code (the “Zoning Code”) as follows: (1) Article 27, Section 27P-5 — -Applicability, South Boston Waterfront IPOD; (2) Article 8, Section 8-7- — Residential dwelling units (C); (3) Article 19, Section 19-1 — Side yard insufficient; and (5) Article 20, Section 20-1— Rear yard insufficient. Notwithstanding the above citation for a side yard deficiency upon the original filing, subsequent changes in placement of the garage entry created a side yard of twenty-nine (29) feet, which is substantially more than the required thirteen and three tenths (13.3) feet required by the Zoning Code.
Under Article 27P, Section 7 the South Boston Waterfront IPOD is divided into certain sub-districts, including the Industrial South Boston Sub-District, where the Proposed Project is sited. These sub-district objectives include protecting and buffering this residential area. The Proposed Project is a residential use that will provide four (4) affordable housing units and twenty-seven (27) market rate housing opportunities. The defendants claim that their Proposed Project meets the goals of providing a buffer to already-existing dwelling units on the East Second Street side of the project, in accordance with the land use objectives of Article 27P, §7. However, the Proposed Project, entirely residential, does not provide a “buffer” between the industrial use located at the rear of the Property and the residential units located directly on East Second Street.
The height of the Proposed Project does not exceed the maximum thirty-five foot (35j height limit. The Floor to Area Ratio (“FAR”) is at 1.73, which is below the maximum 2.0 FAR ratio.
The Proposed Project will provide fifty-two (52) parking spaces, the number of which is more than the number required under the Zoning Code. But where the number provided does not even satisfy the needs of the building occupants, the parking situation of an already overburdened and densely populated area will be exacerbated.
The Proposed Project is in substantial accord with the Interim Parking Controls of the South Boston Waterfront IPOD Study Area, as set forth in Article 27P §13, insofar as the Proposed Project provides for fifty-two (52) off-street parking spaces, which number exceeds the number of spaces required by the Zoning Code. The Interim Waterfront Yard Areas of the South Boston Waterfront IPOD study area do not apply to the Proposed Project.
The Proposed Project is not in substantial accord, however, with the Interim Open Space Requirements of the South Boston Waterfront IPOD Study Area, as set forth in the Zoning Code, Article 27P, §12, which applies to any Proposed Project in the South Boston Waterfront IPOD Study Area involving new construction at grade. Section 27P-12 states that “[a]ny Proposed Project to which Open Space requirements of this Section . . . apply shall devote to Open Space at least fifty percent (50%) of the Lot Area of such Proposed Project.”
Zagorianakos is the managing partner of N&P Associates, which is in the business of real estate development and real estate investment. He is also a principal ofWadleigh, incorporated in 2008, but which had previously been his d/b/a Global Equity Advisors. He has a B.A. degree from UMass Boston, a B.S. in Management and a Master’s Degree in Finance from Boston College. He has also taken six months of DEP *351 and EPA continuing education course work and has three credits from an environmental course at Northeastern. He is a chartered financial analyst (“CFA”), a chartered alternative investment analyst (“CAIA”), holds a Massachusetts building license. While he indicated that he has been licensed as a toxic use reduction planner since the mid-1990s, he did not indicate the entity which allegedly issued the license. He has done some environmental consulting and remediation clean ups through Global Equity d/b/a Wadleigh. He claims that he and his investment partners on this Property received a loan from a bank, which did some kind of environmental assessment by review of some documentation. No documentary evidence as such was offered; no inferences are drawn that the bank determined environmental contamination was not an issue.
Each of the four investors on this project invested $250,000. Zagorianakos and Oratovsky are two of the four investors. Each investor expected, at the time of investment, to reap substantial profit in selling these thirty-one (31) condos.
The biggest problem with this Proposed Project relates to the known contamination on the Property and any potential unknown contamination therein. Given the longstanding industrial and commercial uses of property immediately adjacent to it, which uses include longstanding use of diesel, gasoline and other fuels, it is clear there is at least a “plume” of contamination onto this Property which migrated to it from the adjacent property. No independent,[11] recent testing was offered to the ZBA or to this Court establishing that the Property is currently safe for residential use.
Several environmental reports were offered into evidence during the trial. The Modified Phase IV Remedy Implementation Plan introduced into evidence (“the Report”) is only a portion of the report prepared for Coastal Oil New England in February 2004 by Ambient Engineering. See Ex. 8K. The portion offered does not state what contamination (other than petroleum) was found, but states in §3.1 that the “primary goal of this remediation action is to reach levels of no potential for significant risk of harm to the public welfare and the environment upon future conditions by reducing petroleum residual concentrations in soil to below Upper Concentration Limits.” Id., at §3.1. I infer that in 2004, the property directly adjacent to the Property at issue had soil concentrations of petroleum above the Upper Concentration Limits and that this would be injurious to human health.
On May 1, 2008, Zagorianakos drafted a letter to Senator Hart, who has expressed some concern about the environmental contamination issues on the Property. See Ex. 43. Zagorianakos’ letter advises Senator Hart of data from the Report (not all of which was offered into evidence) as well as borings conducted by/on behalf of Zagorianakos. In his letter Zagorianakos states:
The data clearly indicates that this is NOT A SURFACE RELEASE that originated from the 902 East Second Street property. The data also indicates that the release is traveling within the groundwater from the Coastal Oil (sic) property onto the corner of the 902 East Second Street property. The data also indicates that only a small portion of the 902 East Second Street property is impacted (the northeasterly portion of the property that abuts the Coastal Oil property). This data has been reviewed by Dan Jaffe, LSP of ILS in Somerville, MA in Januaiy 2005 and by Donald Bruehl LSP of Donald Bruehl Consulting Hydrogeol-ogist in November 2007. Both of our LSP’s agreed that our data developed independently of Ambient Engineering, confirms Ambient Engineering’s findings concluded in their Partial Response Action Outcome Report dated December 2004. Additional (sic) there is no indication from the data that any release originated on the 902 East Second Street property.
Ex. 43 at 4.
In addition to the February 2004 Report by Ambient, Wadleigh completed a “Limited Removal Action Completion Report” (“LRA Report”) for the defendants in November 2008. Ex. 44. Soil was removed “as a result of assessment activities after discovery of a slightly elevated level of lead in the urban soil at the site.” Ex. 44 at 1. Under the supervision of Wadleigh personnel, soil was excavated from numerous on-site hot pits from July through August 2008. “On August 11,2008, soil sample analytical results from a depth interval of 2-4 feet from TP-3 indicated slightly elevated levels of lead in the soils which exceeded the applicable MCP RCS-1 and Method 1 Cleanup Standards.” Id. Furthermore,
[t]he site is currently covered by grass and shrubs. Given the surface conditions, depth of the soil contamination (greater than 2 feet), and current use of the property, exposure to the contaminated soils is unlikely. Under the current site conditions, the most likely potential for exposure to the contaminated soil is for a construction worker involved with subsurface excavation.
Id. at 3. The LRA Report goes on to state the following:
The soil contamination has been identified as primarily lead. The extent of soil contamination at the site has been delineated by subsurface investigations. A previous soil analysis that was performed showed exceedances (sic) of lead in excess of applicable MCP Method 1 Cleanup Standards. It has been determined that the contaminated soils at a depth of two to four feet in the vicinity of TP-3 (see Drawing #2 in Appendix A). It is likely that the area of soil contamination has been affected by the construction & urban fill located at the Site . . .
Area of Concern # 1 (AOC-1). This area includes the soils at a depth of two to four feet in the vicinity of TP-3. This area contains the highest concentrations of lead in soil.
*352 Id. at 4. The report concludes:
On-site soil contamination by lead has been detected at the Site.
Contaminants of Concern (COCs) that have been identified during environmental site investigations include Lead. In Wadleigh’s opinion, the impacted soil have been affected by buried construction materials on the 902 East Second Street property.
On November 17, 2008, Wadleigh excavated, removed and disposed of approximately 20 tons of lead contaminated soil from the vicinity of TP-3.
At the completion of excavation activities, confirmation soil samples were collected from the four (4) sidewalls of the excavation at a depth of approximately two to four feet (2’-4’) below grade. Because a Lead soil sample was already obtained and analyzed in August 2008 from the four to five foot depth ofTP-3, no soil samples were collected from the floor of the excavation.
Confirmatory soil samples were submitted to ConTest Laboratories in East Longmeadow, Massachusetts and analyzed for Lead via Analytical Method SW846 3050/6010. Results of the laboratory soil analyses indicates that the maximum concentrations of Lead detected in the soil samples collected from the sidewalls of the excavation (EXC-1) do not exceed the applicable MCP Method 1/S-l soil standards.
Approximately 22.49 tons of excavated LCS was transported to Waste Management’s Taunton Landfill in Taunton, MA, to be reused as daily cover via a Bill of Lading certified by Donald H. Bruehl, LSP, on November 17, 2008.
Id. at 7.
Based on the 2004 Report produced by Ambient and an ISP which defendants’ expert Daniel Jaffe of IES, Inc. (an environmental consulting firm) reviewed, Zagorianakos claims that only a small portion of the Property is impacted by a “plume” of environmental contamination, which migrated onto it from Coastal Oil/Elpaso. He accepts, as do I, that at least some environmental impact was caused to the Property by the migration of industrial contaminants from the property of Coastal Oil/Elpaso. Zagorianakos supervised test borings done on January 10, 2005 by Martin GeoT-echnical, and collected the soil samples which were screened for both capability of soil and for environmental contamination. See Ex. 43. Each sample was screened, using photo ionization detection for gasoline or oil spills. The customary tool he uses, and which he used in this case, is photo ionization detection.[12] In January 2005, he sent the soil and ground water samples to a lab. He reviewed those lab results as part of his due diligence for this project and in order to get bank financing.
On November 17, 2008, Wadleigh performed additional testing at the Property, accompanied by John Zupkas of DEP. Four test pits were dug with a mini excavator and soil from zero to eight feet was tested in ten soil samples. The samples were then submitted to Con-Test Laboratories in East Longmeadow, Massachusetts and analyzed for lead. Zagorianakos claimed that there was no relation between Con-Test Labs and Wadleigh. After reviewing the test results, Zagorianakos wrote a report of this testing. See Ex. 44. He claimed it is part of his job at Wadleigh to create this report. Zagorianakos also claimed that he hired IES, Inc. to create the Preliminary Site Assessment report (Ex. 45) and perform an update of “the document we had done in 2005.” See Ex 46. He claimed it is this report that he distributed to both DEP and the South Boston Public Library, but no confirmation of that was offered. Certainly his report cannot be considered “independent."
From this Court’s perspective, the problem with Zagorianakos’ letter, Ex. 43, as well as with Wadleigh’s report, Ex. 44, is that the conclusions are not “independent." It is clear that at least some portions of the soil on this site are contaminated with at least both lead and petroleum; it is unknown whether any other contaminant(s) is present. What is clear is that, in addition to not having all of the reports done to date, even in the most recent testing, the methods used for the testing, the location, and taking of the soil samples were all directed and accomplished by or on behalf of Mr. Zagorianakos or an entity he controls who has a tremendous personal and financial interest in having no contamination be detected. Accordingly, this Court does not credit that these defendants or the ZBA ever really had the results of or conducted a valid, independent assessment of whether this site is safe for residential occupancy.
RULINGS OF LAW
The plaintiffs’ Second Amended Complaint seeks the following relief: declaratory judgment, mandamus, cer-tiorari and judicial review under G.L.c. 40A, §11. Each count of plaintiffs’ complaint is discussed in turn.
I. Declaratory Judgment, Mandamus & Certiorari
Count I of the plaintiffs’ Second Amended Complaint seeks declaratory judgment pursuant to G.L.c. 231A establishing the rights, duties, status and other legal relations of the parties to this action, including a declaration that the variance granted to the defendants on June 10,2008 is now null and void. However, when a direct and distinct path of review is available, it is generally not appropriate to grant declaratory relief in the absence of special circumstances. Rosenfeld v. Board of Health of Chilmark, 27 Mass.App.Ct. 621, 624 (1989), citing New England. Milk Dealers Assn., Inc. v. Dept. of Food & Agriculture, 22 Mass.App.Ct. 705, 709 (1986). Thus, the plaintiffs’ request for declaratory judgment is denied.
Count II of the plaintiffs’ complaint requests that the court exercise its jurisdiction in the nature of mandamus and enter an order compelling the ZBA to notify the Building Commissioner that the variance granted to the defendants for the Property is null and void so that no building permit may be issued. “The use of mandamus to compel enforcement of zoning provisions [is] available *353 only in circumstances where an aggrieved party was not on notice sufficient to permit a timely appeal from the action that is the cause of his aggrievement.” Gallivan, 71 Mass.App.Ct. at 855, citing Vokes v. Avery W. Lovell Inc., 18 Mass.App.Ct. 471, 482-82 (1984). Gallivan v. Zoning Bd. of Appeals of Wellesley, 71 Mass.App.Ct. 850, 855 (2008). “[M]andamus will not lie where there is available another and effective remedy.” Madden v. Secretary of the Commonwealth 337 Mass. 758, 761 (1958). Given that the parties in the instant case were on notice and there is another available remedy, mandamus will not lie.
Count III of the plaintiffs’ complaint seeks judicial review in the nature of certiorari pursuant to G.L.c. 249, §4 of the propriety of the ZBA’s decision to grant a variance to the defendants. “[T]he requisite elements for availability of certiorari are (1) ajudicial or quasi judicial proceeding; (2) a lack of all other reasonably adequate remedies; and (3) a substantial injuiy or injustice arising from the proceeding under review.” Walpole v. Secretary of Exec. Office of Environmental Affairs, 405 Mass. 67, 72 (1989) citing Boston Edison Co. v. Selectmen of Concord, 335 Mass. 79, 83 (1968). In the present case, where the ZBA’s grant of the variance is reviewable under the Zoning Act, G.L.c. 40A, the plaintiffs cannot avail themselves of G.L.c. 249, §4. See Cumberland Farms, Inc. v. Planning Bd. of Bourne, 56 Mass.App.Ct. 605, 608 (2002) (“a zoning appeal, pursuant to G.L.c. 40A, §17, provided a reasonably adequate remedy” and therefore certiorari was not available).
II. Judicial Review Pursuant to the Zoning Act, G.L. 40A, §11
Count IV of the plaintiffs’ complaint seeks review of the ZBA’s decision as parties in interest pursuant to G.L.c. 40A, §11. The Zoning Act provides that aiiy person aggrieved by a decision of the board of appeals may appeal to this Court and “the court shall hear all evidence pertinent to the authority of the board or special permit granting authority and determine the facts, and upon such facts as so determined, annul such decision if found to exceed the authority of such board." G.L.c. 40A, §17.
A. Standing
The defendants first contend that the plaintiffs lack standing to bring such an appeal. This Court does not have jurisdiction to hear the merits of plaintiffs’ appeal unless plaintiffs have standing as parties aggrieved by the ZBA’s decision. Based on the evidence at trial, this Court concludes that plaintiffs have standing.
“Parties in interest” as set forth in G.L.c. 40A, §11, enjoy a presumption of standing. The statute defines “party in interest” as “the petitioner, abutters, owners of land directly opposite on any public or private street or way, and abutters to the abutters within three hundred feet of the property line of the petitioner.” G.L.c. 40A, §11. If standing is challenged, the jurisdictional question is decided on “all the evidence with no benefit to the plaintiffs from the presumption.” Barvenik v. Board of Aldermen of Newton, 33 Mass.App.Ct. 129, 131 (1992). The presumption “recedes when the party challenging standing offers evidence supporting his or her challenge." Id. When this occurs, the burden of proof is on the party claiming standing. Sherrill House, Inc. v. Board of Appeal of Boston, 19 Mass.App.Ct. 274, 276, review denied, 394 Mass. 1103 (1985). A review of standing based on “all the evidence” does not require that the fact finder ultimately find a plaintiffs allegations meritorious. To do so would be to deny standing, after the fact, to any unsuccessful plaintiff. Rather, the plaintiff must put forth credible evidence to substantiate his allegations. In this context, standing becomes, then, essentially a question of fact for the trial judge. See Bedford v. Trustees of Boston Univ., 25 Mass.App.Ct. 372 (1988).
The plaintiffs here are abutters; thus they are rebut-tably presumed to have standing. In order to prove standing, plaintiffs must identify the interest that they claim will be affected and “(o]f particular importance, the right or interest asserted must be one that the statute under which a plaintiff claims aggrievement intends to protect.” Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20, 27-28 (2006). There must be a “specific showing that the plaintiffs will either be injured or that such an injuiy would be special and different from that which others throughout the zone would experience.” Marashlian v. Zoning Bd. of Appeals of Newburyport, 37 Mass.App.Ct. 931, 933 (1994), quoting Cohen v. Zoning Bd. of Appeals of Plymouth 35 Mass.App.Ct. 619, 623 (1993).
The plaintiffs must put forth credible evidence to substantiate claims of injuiy to their legal rights.[13] Although plaintiffs bear the burden of proving aggrievement, because “[standing is a gateway through which one must pass en route to an inquiry on the merits a plaintiff is not required to prove by a preponderance of the evidence that [their] claims of particularized or special injuiy are true.” Butler v. Waltham, 63 Mass.App.Ct. 435, 441 (2005). Instead, plaintiffs must come forward with “credible evidence to substantiate [their] allegations.” Marashlian, 421 Mass. at 721. To qualify as credible evidence, a proffer “must be of the type on which a reasonable person could rely to conclude that the claimed injuiy likely will flow from the board’s decision.” Butler, 63 Mass.App.Ct. at 441. Nonetheless, “whether a party is aggrieved is a matter of degree; and the variety of circumstances which may arise seems to call for the exercise of discretion rather than the imposition of an inflexible rule.” Rafferty v. Sancta Maria Hospital 5 Mass.App.Ct. 624, 629 (1977) (concluding trial court did not abuse its discretion in finding standing) (citations omitted).
Bearing these principles in mind, this Court applies them to the Findings of Fact set forth above. At trial, plaintiffs raised their personal safety due to groundwater contamination, increased congestion, traffic, decreased *354 parking availability, noise, and diminished light and air as grounds for standing. The following concerns have been recognized by Massachusetts’ appellate courts as a basis for standing under G.L.c. 40A, §17: ground water contamination, see Bertrand v. Bd. of Appeals of Bourne, 58 Mass.App.Ct. 912 (2003) (including “concerns about [the] environmental implications of two nearby septic systems instead of one . . . relate directly to the objectives of the density regulation at issue”); density, see Dwyer v. Gallo, 73 Mass.App.Ct. at 297 (reaffirming notion that “crowding of an abutter’s residential property by violation of the density provisions of the zoning by-law will generally constitute harm sufficiently perceptible and personal to qualify abutter as aggrieved”);[14] traffic, see Marashlian, 421 Mass. at 722-23 (holding concerns relative to “increased traffic... are legitimately within the scope of zoning laws”) & Barvenik, 33 Mass.App.Ct. at 133 (including “possible vehicular traffic increases” in its list of “legitimate zoning-related concerns"); parking, see Barvenik, 33 Mass.App.Ct. at 133 (including “parking problems” in its list of “legitimate zoning-related concerns”); noise, see Contartese v. Mount Washington Bank, No. SUCV 2003-6080, 2006 WL 4326671, *11 (Mass.Super. Dec. 12, 2006), citing Bertrand, 58 Mass.App.Ct. at 912 (upholding standing where abutters expressed concerns about light, noise, and privacy due to construction of two houses on lot zoned for one single-family house); and, diminished light, see Bertrand, 58 Mass.App.Ct. at 912 (finding standing where proposed building would be taller than plaintiffs’ building, and within one foot of their windows, markedly decreasing their “light, air, view, and privacy”).
In the instant case, pursuant to the evidence presented, it is clear that at least some portions of the soil on this site are contaminated with lead and petroleum and therefore there is a legitimate concern of groundwater contamination. Furthermore, the ZBA never conducted or caused to be conducted, a valid, independent assessment of whether this site is presently safe for residential occupancy, therefore the plaintiffs’ concerns cannot reasonably be characterized as ill-founded or speculative. With regard to density, plaintiffs testified, and I accept, that the heavy footprint of the 45,000 square foot structure for the Proposed Project would only compound the existing density in their urban neighborhood. Further, plaintiffs contend, and I accept, that the Proposed Project would “overwhelm the modest three-deckers and existing housing stock nearby.”
Regarding traffic, plaintiffs contend, and I accept, that “[c]hildren on bikes and running on foot will be at added risk in so much added traffic, especially at dusk, at traffic rush hours, and on their way home from night games” from the sports fields and parks located nearby on Farragut Road. Additionally, there is sufficient evidence to support that, while the Proposed Project provision of fifty-two (52) parking spaces may be in excess of the amount required by the Zoning Code and may well satisfy the parking needs of the unit owners/renters, not all the parking needs caused by this development will be satisfied. As such, the parking situation of an already overburdened and densely populated area will be exacerbated. Plaintiffs further allege that the utilization of private balconies, decks and roof decks in the proposed development will create excessive noise. Lastly, Gustowski’s unit, being in the basement, is mostly below grade and she is concerned about light, as there are only small windows in her unit.
This Court concludes that plaintiffs have put forth credible evidence that they will suffer injuries particularized to their properties as a result of the Proposed Project. Thus, this Court concludes that the plaintiffs have standing to pursue an appeal of the variance pursuant to G.L.c. 40A, §11.
B. Standard of Review
An appeal of a municipal board’s decision on an application for a variance or special permit is heard de novo, with the court considering all evidence pertinent to the authority of the board’s action. Pendergast v. Bd. of Appeals of Barnstable, 331 Mass. 555, 558-59 (1954). In accordance with the requirements of G.L.c. 40A, §17, this Court has made independent findings without limiting itself to the presentation at the public hearing before the ZBA or affording evidentiary weight to the ZBA’s findings of fact. Guiragossian v. Board of Appeals of Watertown, 21 Mass.App.Ct. 111, 114 (1985). This Court may only disturb the ZBA’s decision if it is “based on a legally untenable ground, oris unreasonable, whimsical, capricious or arbitrary.” MacGibbon v. Bd. of Appeals of Duxbury, 369 Mass. 512, 515-16 (1976). The court should not concern itself with the wisdom of the board’s action, but must examine whether the board’s decision rests on a legally tenable ground. See Kiss v. Board of Appeals of Longmeadow, 371 Mass. 154 (1976); Federman v. Board of Appeals of Marblehead, 35 Mass.App.Ct. 727, 730 (1994).
The first question for this Court is whether the ZBA had authority to grant the variances to the defendants. Plaintiffs argue that the actions and decision of the ZBA were not according to the law and therefore must be annulled. Conversely, defendants contend that the ZBA acted within its enabling legislation in granting the variance. Specifically, defendants assert that because the ZBA complied directly with the statute and by-laws, it did not act arbitrarily or capriciously to justify this court annulling its decision.
To support the grant of the variance Zagorianakos applied for, the ZBA must find that all of the requirements set forth in the Zoning Act, St. 1956, c. 665, §9, and the Boston Zoning Code, §7-3 are satisfied. See Planning Bd. of Springfield v. Board of Appeals of Springfield, 355 Mass. 460, 461-62 (1969). See also Boyajian v. Board of Appeal of Wellesley, 6 Mass.App.Ct. 283, 284 (1978). The grant of a variance is proper only where the board “specifically find[s]” the facts with respect to all of the requirements. G.L.c. 40A, §10; Warren v. Zoning Bd. of Appeals of Amherst, 383 Mass. 1, 9-10 (1981). The Zoning Act requires that the board “shall cause to be *355 made a detailed record of its proceedings . . . setting forth clearly the reason or reasons for its decision and of its official actions . . .” G.L.c. 40A, §15.
The requirement that the ZBA make specific findings supports informed judicial review of the merits. Prusik v. Board of Appeal of the Building Dept. of the City of Boston, 262 Mass. 451, 458 (1928). The Board must describe “substantial facts which rightly can move an impartial mind acting judicially to the definite conclusion reached.” Id., at 457. The decision of the board is invalid on its face if “(t]he board did not make the explicit findings which are prerequisite to the granting of a variance and which... are not supplied by a bare recital of the statutoiy conditions essential to the granting of a variance.” McNeely v. Board of Appeal of Boston, 358 Mass. 94, 103, (1970). Zoning variances should be granted “sparingly” so as not to destroy the purposes and utility of the zoning code. The 39 Joy Street Condominium Ass’n v. Board of Appeal of Boston, 426 Mass. 485, 489 (1998). The applicant retains the burden of proving the entitlement to a variance before this Court, even if the applicant prevailed in front of the Zoning Board. Warren, 383 Mass, at 10.
C. Variance Requirements
Pursuant to G.L.c. 40A, §9 and Boston Zoning Code, Article 7, §7-3(a), the ZBA must first find that there are special circumstances or conditions applying to the land or structure for which the variance is sought, and fully describe these conditions in the findings. These circumstances may include narrowness, shallowness or shape of the lot or exceptional topographic conditions, peculiar to the land or structure but not to the neighborhood. Id. (emphasis added). The ZBA must determine that circumstances are such that these conditions would deprive the applicant of the reasonable use of the land or structure if the zoning code were applied. Id.
Second, the ZBA must describe the reasons for the practical difficulty and “demonstrable and substantial hardship,” which necessitates granting the variance for reasonable use of the land or structure. G.L.c. 40A, §9; Boston Zoning Code, Article 7 at §7-3(b). Further, the variance must be the minimum variance, which will accomplish this purpose. Id. Third, the ZBA must determine that granting the variance will be in harmony with the general purposes and intent of the Zoning Code and will not be injurious to the neighborhood or otherwise detrimental to the public welfare. G.L.c. 40A, §9; Boston Zoning Code, Article 7 at §7-3(c).[15]
In the instant case, the ZBA’s decision with regard to all three prerequisites appears to be little more than “a bare recital of the statutory conditions essential to the granting of a variance.” McNeely, 358 Mass. at 103. This Court finds that the variance in question fails to satisfy all three of the requirements. First, the ZBA’s decision describes the size, shape and topography of the Property in question, but fails to identify “special circumstances or conditions” applying to the Property, which are “peculiar to such land . . . but not the neighborhood.” Boston Zoning Code, Article 7 at §7-3(a). The ZBA decision notes that the special circumstances or conditions applicable to the Property include, but are not limited to “the exceptional narrowness, shallowness or shape of the lot, or exceptional topographical conditions thereof.” Ex. 1 at 7. However, based on my own observation of the Property and the neighborhood, as well as testimony from the plaintiffs and the defendants’ own architect, the narrowness and shallowness of the Property in question is typical of the immediate neighborhood, if not most of South Boston. Thus, neither the Property’s narrowness, nor its shallowness seems to be a condition especially affecting the lot in question. The ZBA’s finding with regard to “special circumstances or conditions” is ambiguous and does not meet the statutoiy burden, which requires it to make specific findings with respect to the shape, soil conditions or topography of the land.
Next, the ZBA’s decision states that “the granting of the variance is necessary for the reasonable use of the land or structure” and that the variance as granted is “the minimum variance that will accomplish this purpose.” However, there was no evidence presented by the defendants that alternatives were not available. With regard to the rear setback, no variance would likely be required if the underground parking garage for fifty (50) cars went two floors underground, as opposed to just the one floor now proposed. Although this would likely increase building costs and perhaps make the project less profitable for the developers, this alternative was not even considered and therefore there is no basis for granting the variance. With regard to open space, there is virtually none for the Proposed Project. Defendants rely on the inclusion of all of the roof decks and private balconies in their calculation of the Proposed Project’s total open space without explaining whether such space can even qualify as “open space” per the Zoning Code. Furthermore, the proposed building would take up almost the entire lot. The ZBA was never presented with any alternatives and therefore no basis exists for granting the variance for open space.
Finally, the ZBA’s decision states that the granting of the variance will be in “harmony” with the general purpose and intent of the Zoning Code and “will not be injurious” to the neighborhood or “otherwise detrimental to the public welfare.” Ex. 1 at 7. The ZBA made additional findings that “[t]he use will not adversely affect the neighborhood,” “[t]here will be no serious hazard to vehicles or pedestrians from the use,” and “(n]o nuisance will be created by the use.” Id. Again, the ZBA simply parrots the statutoiy language and fails to meet the burden of making specific findings regarding the third prong of the variance analysis.
Therefore, there is no statutoiy basis for a variance under G.L.c. 40A and the ZBA exceeded its authority by approving the defendants’ variance.
*356 ORDER OF JUDGMENT
Accordingly, for the reasons stated above, the plaintiffs’ appeal under G.L.c. 40A, §11 is ALLOWED. It is therefore ORDERED that judgment enter ANNULLING the decision of the City of Boston’s Zoning Board of Appeals granting the defendants’ variance application.

 Apparently the initial ZBA decision was drafted by defendants’ attorneys; the final ZBA decision did not include this proviso. The audio tape of the hearing clearly establishes that the proviso was agreed-upon, though it was not included in the written decision.

 The agreed-upon environmental proviso provides that the following ‘Scope of work’ be completed by the defendants at the Property:
1. Excavation four test pits at various locations on the property, an environmental consultant will monitor the excavation. The soil samples will be collected at two foot intervals from 0 to 8 feet below surface grade and screened for total volatile organic compounds (TVOCs) using an HNU photo-ionization detector (PID) via the MADEP Jar Headspace Method. If elevated TVOCs are indicated, soil samples will [be] collected and analyzed by a Massachusetts certified laboratory for extractable petroleum hydrocarbons (EPH) and by the MADEP Method.
2. Composite soil samples from the 2-4 foot interval and the 6-8 foot interval from each test pit will collected will be analyzed by a Massachusetts certified laboratory for extractable petroleum hydrocarbons (EPH) by the MADEP Method, 8-RCRA metals and PBCs by EPA method 8080.
3. A Limited Subsurface Investigation Report summarizing all the data will be prepared and submitted to the City of Boston Environmental Department, MADEP (Northeast Regional Office) and will be available for public review at the South Boston Branch Library. A public meeting will be held (TBA) by Mr. Zagorianakos to discuss and present the data. The Massachusetts Department of Public Health (“DPH”) will be invited to attend.
Ex. 9

 This is reduced from the original plan of 45 units, but this reduction was not as a result of any community input. Although Zagorianakos claims these changes were made as a result of his meetings with members of the neighborhood, his architect made this design of 31 units in 2005, long before any neighborhood meetings took place.

 Whether 52 parking spaces provides for any “guest” parking is unclear. If each of the 31 units are occupied by two or more persons, each of whom has a car, there will not be enough parking even for all the residents, let alone any guests.

 It is not clear whether roof decks and private balconies/decks count as “open space.”

 Pursuant to Section 6.3, the Board of Appeal will grant an appeal only for conditional use if the specific site is an appropriate location for such use; the use does not adversely affect the neighborhood; there will be no serious hazard to vehicles or pedestrians from the use; no nuisance will be created by the use and adequate and appropriate facilities will be provided for the proper operation of the use. See Boston Zoning Code, Article 6 at §6.3.

 Section 6.3A provides that the Board of Appeal will only grant conditional use for an off-street parking facility if it meets one or more of the following conditions:
a. It will serve a traffic demand not adequately provided for by public transportation; or
b. It will replace existing off-street parking spaces in one or more nearby parking facilities, or it will replace legal on-street parking spaces that have been physically eliminated through permanent modification or demolition; or
c. It is accessory or ancillary to a use which by its nature does not contribute significantly to traffic flows during peak traffic periods; or
d. The facility constitutes a temporary parking lot use of land and that serious intent to reuse the land for an allowed use within a specified period of time has been demonstrated to the satisfaction of the Board of Appeal.

 During the trial, the parties provided a handwritten list of the streets requested to be observed, and which were observed, during the Court’s view.

 Due to Zagorianakos’ involvement with Wadleigh, as well as his substantial financial interest in having no environmental issues surface, this court does not consider Wadleigh to be "independent.”

 Zagorianakos summarized the data from the borings in his May 1, 2008 letter to Senator Hart. See Ex. 43.

 Legal arguments and mere allegations are not sufficient to rebut the plaintiffs’ presumed standing. See Watros v. Greater Lynn Mental Health and Retardation Assoc., Inc., 421 Mass. 106, 111 (1995) (reversing conclusion that presumption of standing may be rebutted by denials in defendant’s Answer); Marinelli v. Bd. of Appeals of Stoughton, 440 Mass. 255, 258 (2003) (“speculation [as to whether named grantor possessed proper] authority [to convey a parcel] on behalf of a trust is insufficient to rebut [the] presumption [of standing]”); Valcourt v. Zoning Bd. of Appeals of Swansea, 48 Mass.App.Ct. 124, 128 (1999) (“[i]t is not enough simply to raise the issue of standing in a proceeding under §17[; t]he challenge must be supported with evidence”). Nevertheless, the defendants may rebut this presumption at trial by proffering expert testimony that affirmatively refutes plaintiffs’ contentions, see Dwyer v. Gallo, 73 Mass.App.Ct. 292, 295 n.5 (2008) (opining private defendant’s proffer of evidence affirmatively contesting allegation of diminution in value sufficient to rebut plaintiffs presumed standing), or by eliciting plaintiffs’ testimony that casts doubt on the factual foundation of their averments of aggrievement. See Denneny v. Zoning Bd. of Appeals of Seekonk, 59 Mass.App.Ct. 208, 216 (2003) (holding plaintiffs failure at trial “to show that her own legal rights were likely to be affected” should have caused her presumptive standing to recede).

 In those cases upholding standing on the basis of density concerns, the plaintiffs were able to identify the manner in which the density of the permitted development would negatively affect their property directly and with specificity. See id., at 296 (explaining how the increased density of the adjacent development would affect plaintiffs privacy in relation to the specific configuration of her home); McGee v. Bd. of Appeal of Boston, 62 Mass.App.Ct. 930, 930-31 (illustrating how the addition of a floor to applicant’s building “within a bit less than a foot of McGee and Schiavoni’s fourth floor” would significantly reduce “their light, air, view, and privacy”); Bertrand, 58 Mass.App.Ct. at 912 (relating plaintiffs’ “articulated concerns about increased noise, increased artificial light,... decreased backyard privacy [, and] the environmental implications of two nearby septic systems instead of one” in a particularly dense neighborhood).

 Section 7-3(d) provides a fourth criteria, which is applicable to Development Impact Projects, as defined in Section 80B-7; however, it is not included in the Court’s analysis because it does not apply in the instant case.